*In re* MARRIAGE OF WILLIAM CARNEY, Petitioner-Appellee, and JOAN CARNEY, Respondent-Appellant.

First District (1st Division)   No. 82—2494

Opinion filed March 19, 1984.

Timpone & Rickelman, Ltd., of Chicago, for appellant.

James T. Friedman and Joseph J. O'Hara, Jr., both of Schiff, Hardin & Waite, of Chicago, for appellee.

PRESIDING JUSTICE BUCKLEY delivered the opinion of the court:

On July 1, 1982, the circuit court of Cook County entered an order dissolving the marriage of petitioner William Carney (William) and respondent Joan Carney (Joan). Joan appeals from that portion of the order relating to property division and maintenance. For the reasons set forth below, we reverse the judgment of the trial court and remand the cause for further proceedings.

The record reflects as follows. The parties have been married twice to each other. The parties were first married in 1961. During the course of their first marriage they had three children, Michael, Diana and Matthew. Upon Joan's petition, the first marriage was dissolved in September 1978. The settlement for the 17-year marriage provided: (1) Joan would retain the marital residence in Northbrook, Illinois; (2) Joan would pay William the sum of $20,000 for his interest in the marital residence; (3) Joan would have custody of the parties' three children; and (4) William would pay Joan a total of $23,800 per year in unallocated permanent maintenance and child support, payable $1,150 per month and $2,250 per quarter.

During the spring of 1979, Joan put the Northbrook home up for sale and began looking for a new home for herself and the children in the Barrington area. In June 1979, William approached her about the prospect of them remarrying and moving to Barrington. Subsequently, Joan agreed to the remarriage and sold the Northbrook home on August 14, 1979.

On August 15, 1979, Joan and William remarried and on the same date purchased a five-bedroom, 3½-bath house on a 1¾ acre site in the suburb of South Barrington. The Barrington home was purchased in joint tenancy for $225,000. The parties made a $100,000 down payment and obtained a mortgage loan in the amount of $125,000. The

funds for the down payment came from the following sources: (1) $17,000 received by Joan from an inheritance; (2) Joan's proceeds from the sale of the Northbrook home in the amount of $67,610.95; and (3) an $18,000 loan from William's parents, for which both parties signed a promissory note.

Shortly thereafter, on November 10, 1980, William petitioned to have the second marriage dissolved, alleging mental cruelty. The case proceeded to trial on a bifurcated basis, with the grounds for dissolution proved by stipulation and the remaining issues heard as a contested mater.

At the time of trial, Joan was 41 years of age. She testified that during the course of the parties' second marriage she was hospitalized on three occasions for emotional stress and alcoholism. She was initially hospitalized in January 1980 for three weeks for emotional exhaustion. Following her release from the hospital, she returned to the Barrington home. In May 1980, she was treated for severe depression in the mental health unit of a hospital for approximately seven weeks. After being released in July, she again returned to the Barrington residence. In November 1980, Joan testified that she "was on the verge of a nervous breakdown" and was hospitalized again for approximately seven weeks. Following this confinement, Joan did not return to Barrington. Instead, she went to live with a girlfriend until May 1981, then stayed with her sister for two months and eventually moved into her own apartment in suburban Schaumburg.

Upon leaving the Barrington home following her last hospitalization, Joan supported herself with temporary support payments from William in the amount of $700, and later $750, per month. To supplement these payments, she obtained various temporary part-time jobs, earning less than $5 per hour. She worked at a delicatessen, as a nurse's aide and as a "Kelly Girl" temporary office worker. She testified that at the time of trial she was working at a White Hen Pantry, walking distance from her apartment, earning $3.50 per hour. Joan's total wages in 1980 were $703.51. She stated that a lack of transportation precluded her from securing full-time employment. She hoped to procure a full-time job once her 1979 Pontiac, which had been barely running, was repaired.

Joan further testified that she received only a high school education and has no vocational skills or training. She was a housewife throughout the approximately 18 years she lived with William, except for briefly working part-time at a toy store. She also stated she was unable to pay her $400 monthly rental payments for five months and was therefore being evicted from her apartment. Additionally, she was

being sued by a department store for $706 unpaid charges. In September 1978, she used $10,000 from an inheritance to pay William $10,000 of the $20,000 owed him under the first judgment of dissolution. An additional $3,000 from her inheritance was used as the down payment on a 1979 Pontiac she purchased during the interim period between the parties' two marriages.[1] The remaining funds from her inheritance have been depleted. Joan stated she has no savings or assets, except for some jewelry her mother left her.

Dr. Mark Round, Joan's treating physician, testified that even though Joan is physically and mentally employable, her mental functions have been impaired as a result of the long-term consumption of alcohol. It was his opinion that Joan will benefit from continual, long-term psychotherapy. Although she has stopped drinking, he classified her as an alcoholic.

William is a partner in a law firm in Chicago. He draws an income of $2,500 per month and additionally receives periodical partnership distributions. He testified that his annual gross income from the the firm was $108,000 in 1981 and approximately $117,000 in 1980. When Joan left the Barrington residence, William maintained the home and provided for the care of the children, including their educational and medical needs. At the time of trial, the children, Michael, Diana and Matthew, were 19, 15 and 13 years of age, respectively. Michael was a student at the University of Illinois-Urbana. William testified that Diana had been injured in an accident and would require additional plastic surgery on her face, and Matthew had injured his knee and would probably need further medical attention. William stated that his monthly expenses for the home and children exceeded his income and he met this deficit by borrowing from various banks and his parents. He listed his total current debts at $57,856.18 as of April 5, 1982, exclusive of the mortgage and various debts incurred by Joan following her separation from William in the amount of $7,503.84, plus interest.

William additionally testified that in September 1978 Joan paid him $10,000 of the $20,000 due him for his interest in the Northbrook home under the prior judgment of dissolution. When Joan agreed to use her inheritance and proceeds from the Northbrook home to purchase the Barrington residence, he stated he "forgave" her for the

---

[1]William testified that upon their remarriage he convinced Joan to place the title to the automobile in joint tenancy. He also stated that pursuant to a court order following the couple's separation he paid $166.37 per month toward the mortgage on the vehicle.

$10,000 still owed to him. In his words, "we wiped it all out" and "put the house back together."

William further stated at trial that he acted as Joan's attorney in the sale of the Northbrook home on the day before the parties remarried. As her attorney, he drafted the documents necessary to convey title to the home, and placed his own name on the deed of conveyance. He admitted that he deposited all of the proceeds from the sale of the home directly into his own personal bank account, rather than in a joint account with Joan.

At the onset of trial, William attempted to introduce into evidence a written appraisal by a realtor, dated September 26, 1981, showing the fair market value of the eight-year-old Barrington home was only $167,000, which was $58,000 less than its purchase price two years earlier. Counsel for Joan objected to the appraisal and it was never admitted into evidence. William testified at trial, however, that the fair market value of the Barrington home had declined to $167,000 due to higher mortgage interest rates, the recession and normal wear and tear on the home. He further stated that he spent approximately $9,740 in home improvements.

Based on the foregoing evidence, the trial court found that: (1) the duration of the parties' second marriage was 15 months; (2) the first marital home in Northbrook became Joan's separate property under the prior dissolution decree, subject to the $10,000 that William alleged was still owed to him for his interest in the home; (3) Joan contributed $84,600 to the acquisition of the Barrington home—$67,600 in sales proceeds from the Northbrook home and $17,000 from an inheritance (her net contribution to the home, however, was reduced by the $10,000 supposedly still owing to William from the prior judgment); (4) William made a total contribution of $73,700 to the Barrington home—$32,700 in mortgage payments, $3,300 in real estate taxes, $9,700 in home improvements, the $18,000 loan from his parents and the $10,000 that the court found was owing from Joan; (5) William contributed $77,000 toward basic family expenses for himself and the children, and incurred an additional $58,000 in expenses for taxes, partnership contributions and unreimbursed professional expenses; and (6) the Barrington home was marital property.

Pursuant to the above findings, the trial court held that William would retain the Barrington residence and assume responsibility for the mortgage and the $18,000 loan from his parents. Joan and William were each awarded $22,000 for their marital interest in the Barrington residence. The parties' interest in the home was based upon the court's assumption that the home had a fair market value of

$167,000. The court then subtracted the current mortgage balance, which was approximately $123,000, and found that the present net equity in the home was $44,000, one-half of which it awarded to each party. The entire breakdown of the property division is as follows:

ASSETS

| Item | Value Distributed to William | Value Distributed to Joan |
|---|---|---|
| Money Market Funds | $ 828.57 | |
| Barrington Residence (Net equity based on alleged fair market value of $167,000) | 22,000.00 | $22,000.00 |
| William's Retirement Fund | 8,800.00 | 8,000.00 |
| 1978 Cadillac | 2,000.00 | |
| 1979 Pontiac | | 5,000.00 |
| Tractor | 500.00 | |
| Furnishings ($20,000) | Unallocated value | Unallocated value |
| TOTAL | $33,328.57 | $35,000.00 |

DEBTS

| Debts Assigned to William | Debts Assigned to Joan |
|---|---|
| $58,615.73 | $7,503.84 |

(Includes $18,000 loan from his parents)

Pursuant to an agreement between the parties, William was awarded custody of the minor children, Diana and Matthew. Joan was awarded rehabilitative maintenance in the amount of $30,000, payable over a period of five years at the rate of $750 per month. Joan's interest in both the home and William's retirement fund were to be paid in $500 monthly installments. William was ordered to pay $1,241.50 towards Joan's attorney fees and costs. Subsequently, Joan and William both filed motions for rehearing which were denied.

I

■ We first address Joan's argument that the trial court erred in its distribution of the property. Specifically, she contends that the lower court abused its discretion in awarding her only $22,000 for her interest in the Barrington home, the parties' principal asset, because this amount was at least $50,000 less than her nonmarital contribution to the home. We agree.

The Illinois Marriage and Dissolution of Marriage Act (Act) (Ill. Rev. Stat. 1981, ch. 40, par. 501 *et seq.*) requires the trial court to divide marital property in an equitable manner, taking into account all relevant factors, and its decision in that regard will not be reversed absent an abuse of discretion. (*In re Marriage of Kopec* (1982), 106 Ill. App. 3d 1060, 1063-64, 436 N.E.2d 684.) A fair and equitable division of marital property under the Act does not require that the marital estate be split in equal proportions. (*In re Marriage of McMahon* (1980), 82 Ill. App. 3d 1126, 1131, 403 N.E.2d 730.) Rather, the Act mandates that the trial court divide the marital estate in a manner that is in "just proportions" after its consideration of the following factors:

"(1) the contribution or dissipation of each party in the acquisition, preservation, or depreciation or appreciation in value, of the marital and nonmarital property, including the contribution of a spouse as a homemaker or to the family unit;

(2) the value of the property set apart to each spouse;

(3) the duration of the marriage;

(4) the relevant economic circumstances of each spouse when the division of property is to become effective, including the desirability of awarding the family home, or the right to live therein for reasonable periods, to the spouse having custody of the children;

(5) any obligations and rights arising from a prior marriage of either party;

(6) any antenuptial agreement of the parties;

(7) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and needs of each of the parties;

(8) the custodial provisions for any children;

(9) whether the apportionment is in lieu of or in addition to maintenance;

(10) the reasonable opportunity of each spouse for future acquisition of capital assets and income; and

(11) the tax consequences of the property division upon the respective economic circumstances of the parties." Ill. Rev. Stat., 1982 Supp., ch. 40, par. 503(d).

In the case at bar, the trial court clearly failed to divide the property in "just proportions" pursuant to the above requisite factors. The court found that the net equity in the Barrington home was $44,000 and split this amount equally between Joan and William, even though William was to retain the home. This division was made pursuant to

the court's determination that each spouse made approximately equal contributions to the home. Specifically, the court found that Joan contributed $84,600 to the residence—$67,600 from the sale of the prior Northbrook residence and $17,000 from her inheritance; her total contribution was reduced by the $10,000 the court found was still due William under the prior decree, despite William's testimony that he forgave Joan for the $10,000 when the Barrington home was purchased. She received no credit for the $18,000 note for which she was jointly and severally liable. The court also found that William contributed approximately $73,700 to the purchase and preservation of the Barrington home—$32,700 in mortgage payments, $3,300 in real estate taxes, $9,700 in home improvements, the $18,000 loan from his parents and the $10,000 owed by Joan.

It is apparent from the findings above that although Joan's contribution to the Barrington home was entirely capital, only a very minor portion of William's contribution was capital. Rather, a substantial amount of his contribution consisted of current expenses incurred for the mortgage and real estate taxes. We note that 97% of the mortgage payments and 100% of the real estate tax payments were tax deductible. Consequently, we are of the opinion that to equate William's current expenses with Joan's capital investment was error, particularly when considering that William is in a 50% tax bracket and made such payments at a time when he was living on the premises and was obligated to provide shelter for his wife and children, who also were residing on the premises.

We further note that the division of the Barrington residence was based upon the assumption that its fair market value declined to $167,000, a $58,000 depreciation in two years, notwithstanding the fact that it was only eight years old, located in a prestigious area of suburban Cook County and, additionally, nearly $10,000 was spent in home improvements. After reviewing the record, we find no credible evidence to support such a valuation. Although William sought to introduce a written realtor's appraisal valuing the home at $167,000, Joan's attorney objected and the appraisal was never incorporated as part of the evidence. Nor did William provide expert testimony at trial as to the value of the home. Instead, William, who was not qualified as an expert, testified that the home's value was $167,000. Upon further questioning, William admitted that his opinion was based "principally" upon the written appraisal that was not received into evidence. Consequently, we find that William's testimony as to the value of the home not only was of a self-serving nature but also constituted rank hearsay and, hence, such testimony was inherently lack-

ing in credibility.

Even if we were to assume that the $167,000 appraisal was correct, we think it unjust to saddle Joan with the entire burden of the dramatic loss in value of the home, which may be only temporary. At the same time, William, who is to retain ownership and possession of the home, would be the sole beneficiary of any increase in its value. Such a result certainly cannot be deemed fair and equitable under the Act in view of Joan's substantial capital investment in the home.

The inequity in this matter is further magnified upon scrutinization of the health, occupation, vocational skills, income and other relevant economic circumstances of each spouse pursuant to section 503(d) of the Act. (Ill. Rev. Stat., 1982 Supp., ch. 40, par. 503(d).) William is a partner in a Chicago law firm, earning a six-figure income. He will retain a five-bedroom, 3½-bath house occupying 1¾ acres in an affluent suburb. Joan, on the other hand, has only a high school education, no vocational skills and at the time of trial was earning $3.50 per hour working at a grocery store. Her total earnings in 1980 were a meager $703. She had suffered serious health problems within the two years preceding this dissolution, requiring her to be hospitalized on at least three occasions with the longest confinement lasting nearly two months. At the time of trial she was being evicted from her apartment and being sued by at least one creditor. Her total cash payment upon the entry of the judgment of dissolution was $500, representing the first monthly payment of her share of the marital property, and she was further ordered to pay her own attorney fees and court costs.[2]

William, in arguing that the property division is equitable, relies on the fact that he was awarded custody of the children and was responsible for certain outstanding debts. After giving due consideration to his argument, we find that these factors in no way lessen the abuse of discretion committed by the trial court in this case. Joan gave up everything she acquired in the earlier judgment, including the Northbrook home and its furnishings and at least $30,000 from an inheritance,[3] and her right to permanent maintenance which, including unallocated child support, initially amounted to $23,800 per year. She

---

[2]The trial court subsequently, upon Joan's amended petition for reconsideration, modified the judgment and ordered William to contribute $1,000 toward the payment of her attorney fees and her costs of $241.50.

[3]The $30,000 consisted of $17,000 Joan contributed at the time the Barrington home was purchased, $10,000 she gave William as part payment she was required to give him under the earlier judgment, and $3,000 she used as the down payment for a 1979 Pontiac.

has received very little in return under the second dissolution—a mere $22,000 for her approximate $84,600 investment in the Barrington home plus $8,000 of William's retirement fund, and that to be paid over a five-year period in equal monthly installments, and a broken-down automobile. Accordingly, we reverse and remand that portion of the judgment relating to property disposition.

■ In remanding this cause, we note that there exists a presumption that the Barrington home is marital property because it was purchased during the marriage and held in joint tenancy. (*In re Marriage of Rogers* (1981), 85 Ill. 2d 217, 422 N.E.2d 635; Ill. Rev. Stat. 1981, ch. 40, par. 503.) This presumption, however, is not conclusive and can be rebutted by clear, convincing and unmistakable evidence that no gift to the marriage was intended. In the instant case, the trial court failed to find that the presumption was rebutted and therefore characterized the Barrington residence as marital property.

When a new trial is held on remand, we urge the court to carefully consider whether the presumption of marital property is indeed rebutted. The record before us at this time clearly reveals the absence of any donative intent on behalf of Joan; at no time did she state that her capital investment to the home was to be a gift. Instead, the uncontroverted evidence establishes that William acted as Joan's attorney in the sale of the Northbrook home prior to their remarriage and placed his name on the deed of conveyance, even though he had no interest in the subject property. He then deposited all of the proceeds from the sale of the home into his own bank account, as opposed to a joint account. At trial, William rationalized these actions by indicating that he was entitled to the proceeds because he forgave Joan for $10,000 she owed him and he had paid for the Northbrook home with his own money, despite the fact that Joan was awarded the Northbrook home in the first judgment. Hence, William himself believed he received the proceeds as a matter of right, rather than as the donee of a gift.

Additionally, we briefly note that in August 1983 section 503(c) of the Act was amended by Public Act 83—129 to provide that a contribution of nonmarital property during the marriage will give rise to a right of reimbursement, notwithstanding any transmutation, except where the contribution is a gift or is untraceable. The amendment provides that it applies to actions pending on its effective date, August 19, 1983. Here, the judgment being appealed from was entered on July 1, 1982, and the action therefore was not pending at the time the amendment took effect. Consequently, we need not consider any impact the amendment may have in this case and, upon remand, the

trial court is to apply the law existing at the time the judgment was entered. *In re Marriage of Sweet* (1983), 119 Ill. App. 3d 1033, 1040, 458 N.E.2d 14; see also *McArdle v. McArdle* (1977), 55 Ill. App. 3d 829, 833, 370 N.E.2d 1309, cited with approval in *West v. West* (1979), 76 Ill. 2d 226, 233, 390 N.E.2d 880.

## II

■ We next turn to Joan's argument that the trial court erred in awarding her rehabilitative maintenance of $30,000 over a five-year period, rather than permanent maintenance. In support of her argument, Joan directs our attention to the fact that upon her remarriage to William she gave up $23,800 per year in unallocated permanent maintenance and child support awarded her under the first judgment of dissolution. She further notes that she is unskilled, was a housewife for a number of years and more recently was employed in various part-time jobs earning less than $5 per hour. William, in response, emphasizes the brevity of the parties' second marriage and testimony by Joan's physician that she is able to work despite her recent health problems.

The Act, in authorizing rehabilitative or time limited maintenance, aims to provide incentive for the spouse receiving support to use diligence in procuring training or skills necessary to attain self-sufficiency. (*In re Marriage of Wilder* (1983), 122 Ill. App. 3d 338, 351.) This goal, however, must be balanced against a realistic appraisal of the likelihood that the spouse will be able to support herself in some reasonable approximation of the standard of living established during the marriage. (*In re Marriage of Hellwig* (1981), 100 Ill. App. 3d 452, 464-65, 426 N.E.2d 1087.) Consequently, this court has determined that limited maintenance is appropriate only where the spouse is employable at an income which would provide approximately the standard of living enjoyed during the marriage. (*In re Marriage of Wilder* (1983), 122 Ill. App. 3d 338, 351.) Conversely, where the spouse is not employable or is employable only at a low income, as compared to her previous standard of living, permanent maintenance is appropriate. (*In re Marriage of Hellwig* (1981), 100 Ill. App. 3d 452, 465, 426 N.E.2d 1087.) The maintenance award rests within the discretion of the trial court and will not be disturbed on review unless it constitutes an abuse of discretion or is against the manifest weight of the evidence. *In re Marriage of Bramson* (1981), 100 Ill. App. 3d 657, 658, 427 N.E.2d 285.

In the present case, the evidence fails to support an award of time limited maintenance. Joan's medical history and lack of a college

education or any skills or training render highly uncertain, if not doubtful, her ability to support herself in five years on a level approximating the above average standard of living enjoyed by the parties during their marriage. (*In re Marriage of Hellwig* (1981), 100 Ill. App. 3d 452, 465, 426 N.E.2d 1087.) Although Joan's physician testified that she is physically and mentally capable of working, he did not testify as to her ability to support herself in the future. Moreover, he stated that her mental function is impaired and recommended Joan seek continued therapy, which in all probability she will have to pay for.

Moreover, this court is quite disturbed by William's assertion that Joan is not entitled to permanent maintenance because of the brevity of the parties' second marriage. On one hand, William is attempting, as a result of the second marriage, to take back virtually everything awarded to Joan in the initial judgment of dissolution, as we noted previously. He then prevails upon the trial court to consider their second marriage of such short duration so as to deny Joan permanent maintenance.

In limiting the maintenance award in this case, the trial court assumed that Joan could attain self-sufficiency in five years. An award of limited maintenance, however, should be predicated upon circumstances disclosed by the evidence, and not mere speculation. (*In re Marriage of Hellwig* (1981), 100 Ill. App. 3d 452, 465, 426 N.E.2d 1087; *In re Marriage of Pieper* (1979), 79 Ill. App. 3d 835, 845, 398 N.E.2d 868.) Based on the record before the trial court, the true ability of Joan to support herself is unknown and a matter of speculation. This lack of evidence, coupled with the fact that Joan gave up the permanent maintenance awarded under the prior decree upon the parties' remarriage, compel us to hold that the trial court abused its discretion in limiting maintenance to $30,000 over a five-year period. Accordingly, we reverse and remand the portion of the judgment relating to maintenance.

▮ We note that in recent cases where the record was speculative as to a spouse's future ability to support herself, this court has refused to affirm awards of rehabilitative maintenance with automatic termination dates. Rather, in such instances, we have remanded with directions to the trial court to retain jurisdiction over the maintenance award in order to review the parties' respective circumstances at a later date and reevaluate the need for further maintenance. (*In re Marriage of Wilder* (1983), 122 Ill. App. 3d 338, 352; *In re Marriage of Campise* (1983), 115 Ill. App. 3d 610, 614, 450 N.E.2d 1333; *In re Marriage of Asch* (1981), 100 Ill. App. 3d 610, 614, 450 N.E.2d 1333;

*In re Marriage of Asch* (1981), 100 Ill. App. 3d 293, 297-98, 426 N.E.2d 1066.) Such a flexible approach should be considered by the trial court in this case on remand.

This cause is reversed and remanded to the presiding judge of the domestic relations division of the circuit court of Cook County for reassignment and a new trial as to the property and maintenance provisions of the judgment for dissolution.

Reversed and remanded.

McGLOON and CAMPBELL, JJ., concur.