*In re* MARRIAGE OF LORETTA PEARSON, Petitioner-Appellant, and RICHARD PEARSON, Respondent-Appellee.

First District (3rd Division)   No. 1—91—1238

Opinion filed September 30, 1992.

Gary E. Dienstag, of Springer, Casey, Dienstag & Devitt, P.C., Joseph H. and Norman Becker, and Selwyn Blum, all of Chicago, for appellant.

Anthony F. Albergo, of Westchester (Francis X. Riley, of counsel), for appellee.

JUSTICE CERDA delivered the opinion of the court:

Loretta Pearson appeals from the November 30, 1990, judgment order dissolving her marriage to her husband, Richard Pearson. In her appeal, Loretta asserts that (1) the trial court erred by ordering rehabilitative maintenance for only 36 months; (2) the amount of

maintenance is insufficient; (3) the trial court's order requiring Richard to contribute to the children's college expenses was inadequate; (4) the trial court improperly apportioned the marital debts; (5) the trial court erred in failing to order Richard to contribute retroactively to the children's high school expenses; (6) the trial court erred in requiring Loretta to pay one-half of Richard's expert witness' fees; (7) the trial court erred in failing to order Richard to account for the cash value of a cashed-in life insurance policy; (8) the trial court improperly apportioned the attorney fees incurred by Loretta; and (9) the trial court erred in awarding fees to Loretta's former attorney, David Goldstein.

Richard and Loretta Pearson were married on July 9, 1966, and have two children. Michael was born on July 5, 1968, and Colleen on August 28, 1970. At the time of the dissolution of marriage, Loretta was 46 years old and Richard was 48 years old.

Loretta received a bachelor of arts degree in 1965 and has a current teaching certificate. When the Pearsons got married, Loretta was teaching full time, earning between $10,000 and $12,000 per year. She used part of her income in August 1968 to pay the $6,000 down payment on the Pearsons' first home. At that time, Richard was earning about $17,000 per year from his employment at Commonwealth Edison.

When Loretta's mother died in 1966, Loretta inherited $10,000, which she used to buy furniture and pay bills. In 1969, when her father died, Loretta received a $25,000 inheritance, $23,000 of which was used toward the $33,000 down payment on the Pearsons' second home. A $4,000 profit from the sale of stocks, which had been a gift from Loretta's uncle, was used to purchase, paint, and repair that home. The only other account the Pearsons had was a small savings account.

A few months before Michael's birth in 1968, Loretta stopped working. That was the last time she worked full time. Loretta's job became caring for the children and the home. According to Loretta, Richard helped very little with the children and home responsibilities, telling her that was her job. Loretta stated that Richard did not want her to work when the children were small. Richard testified, however, that he told Loretta that she could work if she wanted, but did not insist on it. Richard testified that Loretta was a good mother and properly maintained the household.

In 1978, when Colleen was in the second grade, Loretta worked as a substitute teacher one or two days a week, earning approximately $4,000. At that time, Richard, who was earning about $30,000

per year, paid the mortgage and gave Loretta money toward the household expenses. Whenever that money did not cover the expenses, Loretta contributed her income.

During the marriage, the Pearsons' yearly family vacations to Florida, Hawaii, Las Vegas, Wisconsin Dells, and Arizona were paid for jointly. About once a week, they went to parties, dinner, plays, or other places.

After Loretta filed a petition for dissolution of marriage on September 25, 1984, both she and Richard remained in the marital home. From 1984 to 1987, Loretta testified, she paid $13,729.04 in mortgage payments in addition to the household expenses, insurance, food, house repairs, and legal fees. Loretta stated that the money came from her salary as a substitute teacher, possessions she sold, and money she borrowed from relatives and friends. Income tax returns indicate that Loretta earned $760 in 1984, $1,500 in 1985, and $1,559 in 1987. Loretta claimed that Richard gave her money on an irregular basis during that time.

Richard testified that he paid the mortgage, bills, and the children's tuition in 1985, 1986, and 1987. He stated that he gave Loretta his entire paycheck minus $50 every two weeks from 1984 to 1987. He estimated that he gave Loretta $700 from every paycheck in 1984 and $900 every other week from 1985 until August 1987.

According to Loretta, Richard did not want the children to attend parochial grammar school, but agreed that they could go to parochial high schools. From 1982 to 1986, Michael went to St. Joseph High School. Loretta testified that she paid $5,939.13 for Michael's high school expenses, for which she used money from her employment, selling possessions she had inherited from her mother, and borrowing money from friends and relatives. Loretta claimed that Richard never made any contributions to Michael's high school expenses, but Richard presented receipts for a $425 payment on November 1, 1985, and a $325 payment on February 13, 1986, for Michael's tuition.

From 1984 to 1988, Colleen went to Immaculate Heart of Mary High School. Loretta testified that she paid $7,770.95 for Colleen's tuition and expenses from her employment, the sale of possessions, and borrowing money from friends and relatives. Loretta stated that Richard refused to contribute toward Colleen's tuition, but Richard presented receipts documenting that he paid the school $340 on November 21, 1985, $130 on January 30, 1986, and $460 on March 12, 1987. In addition, Richard maintains that Loretta paid part of Colleen's tuition from his support money in May 1988.

In 1986 and 1987, Richard damaged two bedroom doors by putting his fist through them. On September 24, 1986, an order of protection was entered, restraining Richard from striking, threatening, or harassing Loretta, Colleen, and Michael. Richard moved out of the house on April 12, 1987. At that time, Loretta was employed as a substitute teacher, earning $35 to $55 a day. She averaged about $100 per week, but did not work every week. That was the last time Loretta worked as a substitute teacher.

A court order for $400 temporary support was entered on June 1, 1987. Loretta testified that Richard gave her irregular support from April 1987 until October 1987. She also stated that she paid most of the mortgage, food, utilities, and automobile insurance with $5,000 borrowed from relatives and friends during that time. Richard testified that he gave Loretta $1,200 and directly paid the mortgage payments from April 1987 to October 1987.

On August 26, 1987, the court entered a temporary order requiring Richard to submit all of Loretta's medical bills for reimbursement through his employer's insurance plan and to pay any medical expenses not covered by the insurance. The court also ordered that the Pearsons' income tax refund check of $1,095.07 be used to pay Colleen's parochial school expenses. Loretta testified that some of those medical bills remain unpaid and she is out of pocket $556.72 for prescriptions. Richard testified that he never received any checks for health insurance claims.

On October 29, 1987, the court entered a temporary support order requiring Richard to pay $450 every other week plus the mortgage on the marital home. He was also ordered to investigate the whereabouts of $4,000 that an insurance agent took from their $10,000 whole life insurance policy. Richard testified that he never pursued the insurance issue.

On Richard's petition, the court modified the temporary support order on February 1, 1989, ordering Richard to pay $300 every other week plus the mortgage and $150 on arrearages from the previous temporary support order. There was a stipulation that Richard made those payments.

At the time of the trial, Michael was 21 years old and a college student at DePaul University. He was living at home with Loretta and commuting every day to school. He planned to graduate in June 1990. Loretta stated that she contributed $307.48 towards his college fees and books. In addition, Michael had a government loan of $8,490, to be repaid after graduation. Michael was giving Loretta $200 per month toward his car payment and insurance, but was not paying any

room or board. Richard testified that he did not contribute any money to Michael's college expenses.

Colleen was 19 years old and a college student at the College of Du Page School of Nursing, studying toward an RN degree. Although the school is a two-year college, the nursing program runs for four years. Colleen was living with Loretta, who spent $560.78 toward Colleen's college fees, tuition, and books. Colleen was receiving various grants for her tuition. She was giving Loretta $200 per month toward her car payment, insurance, and repairs. Richard stated that he did not contribute any money toward Colleen's college expenses.

At the time of the trial, Loretta claimed that her total monthly expenses were $3,054.37, including heat, telephone, cable television, automobile expenses, teaching certificate fees, church donations, and clothing costs. After Richard's $600 support payment and the children's part-time earnings, Loretta stated that there was a $2,054.37 monthly deficit. She testified that she made up the deficit by selling possessions and borrowing money from friends and relatives. Loretta estimated that she had borrowed about $12,000 since 1984. Loretta stated that she had no IRA's, stocks, bonds, savings, or pension.

Loretta, who was unemployed, last worked in October 1989 at a part-time job with a sales company. At that time, she worked 18 hours per week and earned $6.50 per hour. Her average take-home pay was $117 to $120 per week. She left that job because she could not perform the physical labor necessary. Loretta maintains that she cannot work as a full-time teacher because she cannot pass the physical exam. She admitted, however, that she had not applied for a teaching position.

Richard is employed by Commonwealth Edison, where he has worked for the last 25 years. He earns $41,958 per year and is vested in his pension plan. If he were to retire now, he would receive $1,397 a month from his retirement plan. At the normal retirement age, he will receive $2,841 per month. Richard also has a company stock purchase plan, whose value he will receive when he retires. He has no current savings account, but has had an IRA for the last 10 years. His last deposit was $4,000.

Richard's take-home pay is $1,200 every other week. His total average expenses, including the $476 mortgage payment on the marital house, are $2,600. It was stipulated that the marital home was worth $135,000 with a $22,000 outstanding mortgage.

Since a major issue is Loretta's health and ability to work, there was extensive testimony about her medical condition. Dr. Stephen Kozlowski, an internal medicine specialist in rheumatology, testified

that he had treated Loretta since February 1985. At that time, he took a medical history, conducted a physical exam, and took several blood tests, including a complete blood count, serum chemistry survey, sedimentation rate for inflammation, and tests for rheumatoid arthritis, lupus, and thyroid function. The blood tests showed mild anemia and a positive antinuclear antibody test, which most commonly indicates systemic lupus, an autoimmune disease, although it can also indicate other diseases.

Dr. Kozlowski diagnosed Loretta as having fibromyositis, which is a painful condition of the muscles and joints associated with sleep disturbance and a sense of fatigue worsened by poor sleep, stress, and physical exertion. He prescribed amitriptyline, a mood elevator, as a mild sedative at bedtime and Norgesic Forte, a muscle relaxant. In March 1985, Dr. Kozlowski prescribed Motrin for pain in Loretta's muscles and back. In February 1986, Loretta complained of joint pain, headaches, and severe oral ulcers.

In May 1987, further tests were conducted. There were no symptoms of lupus recorded by the doctor and the antinuclear antibody and rheumatoid arthritis tests were negative. A urinalysis showed a trace of protein and blood, which sometimes indicates an inflammatory kidney condition related to lupus. At that time, Dr. Kozlowski treated Loretta for musculoskeletal pains and prescribed Amoxicillin, an antibiotic, for an upper respiratory infection.

In April 1988, Dr. Kozlowski prescribed Imipramine for fibromyositis. On May 27, 1988, Dr. Kozlowski saw Loretta for leg pain and swelling, but did not prescribe any medication.

On October 27, 1989, Loretta complained of aching all over, poor sleep, and awakening feeling tired. An examination showed tender joint trigger points. Dr. Kozlowski prescribed Flexeril, a muscle relaxant, and Naprosyn, an anti-inflammatory pain reliever.

In November 1989, a complete blood profile showed abnormal results, including anemia, iron deficiency, elevated cholesterol, and a positive antinuclear antibody factor, related to lupus. No medications were prescribed at that time. A repeated complete blood count on November 19, 1989, indicated that Loretta was no longer considered anemic.

Although Dr. Kozlowski testified that Loretta possibly had lupus, he could not state with any medical certainty that Loretta was suffering from lupus. He based his opinion on her symptoms, which included muscular pain, joint pain, fatigue, sensitivity to the sun, a low-level positive antinuclear antibody test, and mild anemia.

Dr. Kozlowski's opinion was that Loretta's fibromyositis and possible lupus has an effect on her ability to be employed because her fatigue, weakness, and lack of exercise capacity impair her ability to function in the workplace. Fibromyositis makes it difficult to maintain energy and alertness during the workday. The lack of exercise capacity makes it difficult to sustain any physical activity for any significant length of time. Loretta's muscle condition also creates a sense of weakness, making it difficult to lift any significant amount of weight. Dr. Kozlowski stated that he did not feel that physical therapy would be effective to treat Loretta's condition.

On May 14, 1987, the trial court ordered Loretta to be evaluated by Dr. Robert G. Strnad, an internal medicine doctor who was Richard's expert witness. After explaining lupus and fibromyositis, Dr. Strnad testified that 80% to 90% of lupus cases and fibromyositis cases are treated with anti-inflammatory drugs, including aspirin and ibuprofen. In addition, many fibromyositis cases are also treated with muscle relaxants.

Dr. Strnad stated that he examined Loretta on August 4, 1987, and took a personal history. Prior to the examination, he had reviewed medical records from other doctors. In November 1987, Dr. Strnad performed tests, including an antinuclear antibody analysis, a sedimentation rate, and an anti-DNA test, which did not indicate any inflammation. Dr. Strnad explained that fibromyositis does not involve inflammation.

According to Loretta's doctor reports, Dr. Strnad testified that Loretta was treated for allergic inflammation of the nasal passage from 1978 to 1984, and fibromyositis from the early 1970's to the middle 1980's. The October 1983 Mayo Clinic records indicated that Loretta suffered from stress myalgia, which is muscle pain due to stress.

Dr. Strnad's opinion was that Loretta did not suffer from lupus or any other inflammatory disease and was not restricted from functioning in any way. He did not, however, consider the laboratory tests he performed as conclusive. Although moderate to severe lupus would probably show up in those tests, Dr. Strnad explained, moderate or severe fibromyositis probably would not appear in those tests.

Further, Dr. Strnad testified that Loretta's complaints could be symptomatic of many diseases, including fibromyositis. Dr. Strnad explained that the pain from fibromyositis can be reasonably severe and affect a person's ability to function to certain limited degrees.

At the end of the trial, Loretta's attorneys petitioned for the balance of their attorney fees of $3,732.31 for Jeanne Jardine, $4,000 for

David Goldstein, and $10,787.50 for Norman Becker and Selwyn Blum. Richard's attorneys petitioned for the balance of their attorney fees of $13,633.50 for Anthony Albergo and John Pennie, and $6,850 for Ira Feldman.

The trial court found that Loretta did not have lupus, but has some medical problem and is under medical care, which would not preclude her from seeking appropriate employment. The trial court entered a judgment for dissolution of marriage as follows:

1. Loretta was awarded rehabilitative maintenance of $600 per month for 36 months, with any further maintenance barred.

2. The marital residence was to be sold and divided 65% to Loretta and 35% to Richard.

3. Loretta was to keep the 1986 automobile.

4. Loretta was to receive one-half of Richard's interest in his pension plan and employer savings and investment plan that had accrued up to the date of the entry of the judgment.

5. Richard was to be liable for the payment of Colleen's future tuition, books, and supplies while she attends Du Page College.

6. The sum of $1,600 held by Loretta's former attorney, David Goldstein, was to be divided equally.

7. Richard was to pay $1,000 toward attorney Jeanne Jardine's fees and Loretta was to pay the $800 balance.

8. Richard was to pay $1,000 toward attorney David Goldstein's fees and Loretta was to pay $1,000.

9. Richard was to pay $3,000 toward attorneys Joseph H. and Norman Becker's fees, and Loretta was to pay $4,500.

10. The parties were to each pay one-half of Dr. Strnad's outstanding $1,700 bill.

11. Richard was liable for the payment of $4,700 to attorneys Albergo and Pennie and $5,000 to attorney Ira Feldman.

12. All other rights, claims, and demands were barred.

The parties later agreed that Loretta could purchase Richard's interest in the marital home without prejudice to her right to appeal the judgment.

On appeal, Loretta asserts that the trial court abused its discretion in awarding her rehabilitative maintenance limited to 36 months. Loretta argues that the trial court should have ordered permanent maintenance that would be modifiable based on the parties' changing needs and terminable if the court felt that Loretta was not making reasonable attempts to secure employment. Alternatively, Loretta asserts that the court should have reserved jurisdiction to review the award instead of barring any maintenance after 36 months.

As to her contention that she should receive permanent maintenance, Loretta contends that rehabilitative maintenance is inappropriate because the evidence is insufficient for determining her future employability. Even if it can be assumed that she could secure future employment, Loretta maintains that there was no showing that she was employable at an income that would provide the standard of living enjoyed during the marriage.

Loretta states that the evidence showed that she was 46 years old and had been a housewife raising two children during most of the 24-year marriage. Although she has a current teaching certificate, Loretta maintains that her responsibilities as a housewife raising two children for 24 years kept her from the job market, from obtaining a permanent teaching position, or acquiring any type of teaching seniority or tenure. She indicates that it is speculative that she can even get a full-time teaching position, especially one with any type of security for the future or one that will allow her to enjoy the high standard of living established during the marriage. Moreover, Loretta argues, there was no evidence of current or future salaries for teachers with her qualifications.

Loretta emphasizes that her medical problems affect her future employability. Although there is uncertainty whether she suffers from lupus, the trial court found that Loretta has some medical problem and is under medical care. Even if she were not prevented from presently seeking employment, Loretta argues, her medical condition could lead to future impairment of her employability.

Richard responds that the trial court did not abuse its discretion by denying permanent maintenance and limiting rehabilitative maintenance to 36 months. Since Loretta has a current teaching certificate, several years of teaching experience, and some business experience, Richard contends that 36 months are adequate for Loretta to find appropriate full-time employment.

Richard also argues that Loretta is mentally and physically capable of doing the type of work for which she is trained, experienced, and qualified. He asserts that Loretta is alleging health problems only to avoid becoming self-sufficient. Furthermore, Richard states that the property distribution was fair and adequate, and the children are adults in college.

Section 504 of the Illinois Marriage and Dissolution of Marriage Act (IMDMA) (Ill. Rev. Stat. 1989, ch. 40, par. 504) provides that the court may grant a maintenance order in a dissolution of marriage proceeding only if it finds that the spouse seeking maintenance:

"(1) lacks sufficient property, including marital property apportioned to [her], to provide for [her] reasonable needs, and

(2) is unable to support [her]self through appropriate employment or is the custodian of a child whose condition or circumstances make it appropriate that the custodian not be required to seek employment outside the home, or

(3) is otherwise without sufficient income." Ill. Rev. Stat. 1989, ch. 40, par. 504(a).

The IMDMA authorizes rehabilitative, or time-limited, maintenance so that the spouse receiving the support has the incentive to use diligence in getting the training or skills necessary to attain self-sufficiency. (*In re Marriage of Kusper* (1990), 195 Ill. App. 3d 494, 500; *In re Marriage of Jones* (1989), 187 Ill. App. 3d 206, 229.) This goal must be balanced against a realistic appraisal of the likelihood that the spouse receiving support will be able to support herself in some reasonable approximation of the standard of living established during the marriage (*In re Marriage of Albiani* (1987), 159 Ill. App. 3d 519, 523), especially where the marriage was of a long duration and the spouse has had a long absence from the labor market. *In re Marriage of Hellwig* (1981), 100 Ill. App. 3d 452, 464-65.

In determining the amount and duration of maintenance, the court must consider all relevant factors, including:

"(1) the financial resources of the party seeking maintenance, including marital property apportioned to [her], and [her] ability to meet [her] needs independently ***;

(2) the time necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment;

(3) the standard of living established during the marriage;

(4) the duration of the marriage;

(5) the age and the physical and emotional condition of both parties;

(6) the ability of the spouse from whom maintenance is sought to meet his needs while meeting those of the spouse seeking maintenance; and

(7) the tax consequences of the property division upon the respective economic circumstances of the parties." Ill. Rev. Stat. 1989, ch. 40, par. 504(b).

Illinois courts have approached future maintenance in three ways. Where the spouse is not employable or is employable only at a low income, as compared to her previous standard of living, permanent maintenance is awarded. (*Albiani*, 159 Ill. App. 3d at 524.) Perma-

nent maintenance may be appropriate when the spouse seeking support has no realistic prospect of obtaining employment, after a long marriage, especially where the spouse was insulated from developing her skills or career. (*Jones*, 187 Ill. App. 3d at 229.) Illinois courts give careful consideration to a permanent maintenance award to a wife who has undertaken to have children, raise and support the family, and who have lost or been substantially impaired in maintaining their skills for continued employment during the years her husband was getting his education and becoming established in his career. *In re Marriage of Rubinstein* (1986), 145 Ill. App. 3d 31, 40.

Rehabilitative maintenance may be appropriate under circumstances where the evidence indicates future employability (*Jones*, 187 Ill. App. 3d at 229) at an income that would provide approximately the standard of living established during the marriage (*Albiani*, 159 Ill. App. 3d at 523-24). The doctrine of rehabilitative maintenance requires that the trial court consider the extent to which the receiving spouse has either the present ability or the future ability to become self-sufficient or the future ability to acquire skills that would allow entry into the job market. (*Jones*, 187 Ill. App. 3d 206.) Rehabilitative maintenance should be based on the actual evidence presented, not on mere speculation. *In re Marriage of Krupp* (1990), 207 Ill. App. 3d 779, 798.

Many Illinois courts have taken a third approach where they have reserved jurisdiction to encourage a spouse to become self-sufficient while providing the court with an opportunity to review the award at the end of a fixed period to determine what efforts the spouse has made toward achieving this objective and whether those efforts have been successful. (*Jones*, 187 Ill. App. 3d at 229; *Albiani*, 159 Ill. App. 3d 519; *In re Marriage of Asch* (1981), 100 Ill. App. 3d 293.) Where the record is speculative as to the spouse's future ability to support herself, the appellate court has refused to affirm awards of rehabilitative maintenance with automatic termination dates. In such cases, the court has remanded the matter with directions to the trial court to retain jurisdiction over the maintenance award in order to review the parties' respective circumstances at a later date and reevaluate the need for future maintenance. See *Kusper*, 195 Ill. App. 3d at 500; *In re Marriage of Courtright* (1987), 155 Ill. App. 3d 55, 61; *In re Marriage of Carney* (1984), 122 Ill. App. 3d 705, 716; *In re Marriage of Wilder* (1983), 122 Ill. App. 3d 338, 352; *In re Marriage of Campise* (1983), 115 Ill. App. 3d 610, 614; *Asch*, 100 Ill. App. 3d at 297-98; *In re Marriage of Pieper* (1979), 79 Ill. App. 3d 835, 845.

Some of the cases cited by the parties have similar facts as this case. In *Carney*, the court reversed and remanded the wife's five-year rehabilitative maintenance because the true ability of the wife to support herself was unknown and speculative. (*Carney*, 122 Ill. App. 3d at 717.) The wife, who was suffering from emotional stress, severe depression, and alcoholism, had a high school education and no vocational skills or training. (*Carney*, 122 Ill. App. 3d at 707.) The wife's doctor testified that she was mentally and physically employable, but her mental functions had been impaired as a result of long-term alcohol consumption even though she had stopped drinking alcohol. (*Carney*, 122 Ill. App. 3d at 708.) The appellate court stated that the trial court abused its discretion and should be more flexible in its approach. *Carney*, 122 Ill. App. 3d at 716.

The court in *In re Marriage of Rothbardt* (1981), 99 Ill. App. 3d 561, 569, ruled that justice would be better served by the trial court retaining jurisdiction to be able to later review the maintenance award. The wife had Ph.D. and J.D. degrees, but had failed to pass the bar examination three times. Additionally, she suffered from Gaucher's disease, a form of anemia, which would not limit her employment potential. *Rothbardt*, 99 Ill. App. 3d at 569.

In *Courtright*, the court affirmed the trial court's order of rehabilitative maintenance reviewable after two years. (*Courtright*, 155 Ill. App. 3d at 61.) The court stated that the order, which provided for complete review at the end of two years, was appropriate since both parties' conditions were fluid at the time of the judgment. (*Courtright*, 155 Ill. App. 3d at 61.) The wife, who was in her mid-50's, had a bachelor of arts degree in education from Northwestern University, but was not currently licensed to teach. The only work she had done outside the home since 1958 had been seasonal work as a switchboard operator, earning $5.75 per hour. She was generally in good health even though she had some arthritis in her right foot and a lingering disability in her left foot from childhood polio, which prohibited her from standing on her feet for long periods of time. (*Courtright*, 155 Ill. App. 3d at 57.) The marriage had lasted for 29 years and there were four adult children from the marriage. *Courtright*, 155 Ill. App. 3d at 56.

A maintenance award is within the trial court's discretion. (*Albiani*, 159 Ill. App. 3d at 524.) It will not be disturbed on review unless it is an abuse of discretion or against the manifest weight of the evidence. (*Jones*, 187 Ill. App. 3d at 227.) An abuse of discretion occurs when no reasonable person would take the view adopted by the trial court. *Jones*, 187 Ill. App. 3d at 227.

■ Although the trial court did not abuse its discretion in denying permanent maintenance, it did abuse its discretion in ordering a 36-month limitation on the rehabilitative maintenance. Although Loretta does not have systematic lupus, she has a medical condition for which she is under a doctor's care. Since the record is speculative as to her future ability to support herself at the standard of living established during the marriage, the trial court's 36-month limit on the award of rehabilitative maintenance is reversed and remanded. On remand, the trial court is instructed to retain jurisdiction in order to fully review and reevaluate the need for future maintenance after the 36-month period has expired.

Next, Loretta asserts that the trial court abused its discretion in awarding an inadequate amount of maintenance to meet her reasonable needs measured by the standard of living enjoyed during the marriage. We disagree.

To determine the amount of maintenance, the court must determine the reasonable needs of the spouse seeking maintenance in light of the overall circumstances. (*In re Marriage of Holman* (1984), 122 Ill. App. 3d 1001, 1013.) Except where the financial situation of the paying spouse, the duration of the marriage, or the health of the parties indicates otherwise, the amount of maintenance should be sufficient to provide the spouse with the standard of living established during the marriage. *Krupp*, 207 Ill. App. 3d at 793.

In determining the ability to meet one's needs, the party seeking maintenance is not required to liquidate assets or impair capital in order to maintain the standard of living established during the marriage. (*Holman*, 122 Ill. App. 3d at 1013-14.) Other factors to consider include the duration of the marriage, the financial resources of the spouse seeking maintenance, the spouse's ability to become self-supporting, any income-producing property of the spouse, the value of the nonmarital property, and the ability of the spouse from whom maintenance is sought to meet his reasonable needs as well as his maintenance responsibility. (Ill. Rev. Stat. 1989, ch. 40, par. 504(b); *Krupp*, 207 Ill. App. 3d at 792; *Kusper*, 195 Ill. App. 3d at 499; *Jones*, 187 Ill. App. 3d at 228; *Courtright*, 155 Ill. App. 3d at 61; *Holman*, 122 Ill. App. 3d at 1013-14.) No one factor is determinative. (*Jones*, 187 Ill. App. 3d at 228.) The court has wide latitude in considering what factors should be used in determining the reasonable needs. *Krupp*, 207 Ill. App. 3d at 793.

■ After adequately considering all the relevant evidence, the trial court did not abuse its discretion by ordering a $600-per-month maintenance award. Thus, we affirm that award.

Loretta then asserts that the trial court erred in refusing to order Richard to adequately contribute to the children's college education. At the time of the November 1990 judgment, Michael had graduated from college and Colleen had 1½ more years of nursing school.

While the court is authorized to order payment of a child's college expenses, including reasonable living expenses, from the property and income of either or both parents (*In re Marriage of Falat* (1990), 201 Ill. App. 3d 320, 327), it is not mandated to do so. The legislative intent of the IMDMA's section 513 is that the trial court have discretion in determining this issue. (*In re Support of Pearson* (1986), 111 Ill. 2d 545, 551.) In making its determination, the trial court must consider all relevant factors that appear reasonable and necessary, including financial resources of both parents, standard of living the child would have enjoyed had the marriage not been dissolved, and the financial resources of the child. Ill. Rev. Stat. 1989, ch. 40, par. 513.

■ The trial court carefully considered all relevant factors. It did not abuse its discretion by ordering Richard to pay only Colleen's future college tuition, books, and supplies, without reimbursing Loretta for Colleen's first-year college expenses or any of Michael's college expenses.

Next, Loretta asserts that the trial court erred when it failed to order Richard to reimburse her for marital debts, including the mortgage and medical expenses paid by Loretta. Loretta maintains that she had the sole responsibility of assuming substantial marital debts that arose when Richard failed to support the family for a substantial period of time from 1984 until 1987. In the alternative, Loretta requests that the issue of the outstanding medical bills be remanded to the trial court since the trial court did not address that issue. This argument has no merit.

■ The trial court ordered Richard to continue making the mortgage payment on the marital house until it was sold. In addition to hearing evidence from both Loretta and Richard about the mortgage payments, the trial court examined the various receipts and other exhibits. There was evidence that Richard gave Loretta the money to pay the mortgage and other household expenses from 1984 to April 1987 while he was still living in the marital home. From June 1987 through the November 1990 judgment, Richard was paying court-ordered support as well as the mortgage. While there was some evidence that Richard's payments were irregular from April 1987 through February 1989, it was stipulated that he made all the required payments after that time.

There was no abuse of discretion in the apportionment of the marital debt. The trial court carefully considered all the relevant evidence over many months. Thus, we affirm.

Next, Loretta asserts that the trial court erred by not ordering Richard to reimburse Loretta for the children's high school expenses while the dissolution of marriage was pending in court. We do not agree.

■ Even though Loretta filed the petition for dissolution of marriage in September 1984, Richard did not move out of the marital home until April 1987. At that time, Michael was 18 years old and out of high school. Colleen was 16 years old and a junior in high school. There was evidence that Richard continued to support his family while he was still living in the marital home and paid $830 toward Colleen's high school tuition and $750 toward Michael's high school tuition. In addition, Richard was paying Loretta monthly unallocated support from 1987 until the judgment.

Retroactive allowance of child support, including private school expenses (*In re Marriage of Dulyn* (1980), 89 Ill. App. 3d 304), is within the trial court's discretion if such allowance is fit, reasonable, and just. (*In re Marriage of Rogliano* (1990), 198 Ill. App. 3d 404, 410.) Although the court may make a provision for education and maintenance of the children whether it is requested before or after the child has become an adult (Ill. Rev. Stat. 1989, ch. 40, par. 513), the trial court did not abuse its discretion by not ordering Richard to pay retroactive educational expenses.

Next, Loretta asserts that the trial court erred in ordering her to pay one-half of Dr. Strnad's outstanding $1,700 bill since he was appointed by the trial court pursuant to Supreme Court Rule 215 (134 Ill. 2d R. 215) at Richard's request. Moreover, Loretta argues that it is not equitable to assess any portion of Dr. Strnad's fees against her. Richard responds by arguing that Loretta was not cooperative in being examined by Dr. Strnad, that the trial court does not have to abide by previous court orders entered by other judges, and that the parties agreed to the apportionment of the fees.

■ We affirm the trial court's ruling. Although the original court order appointing Dr. Strnad specifically required Richard to pay the cost of the examination, the court has the inherent power to amend and revise interlocutory orders by other judges any time before the final judgment. (*Towns v. Yellow Cab Co.* (1978), 73 Ill. 2d 113, 120-21.) Furthermore, the apportionment term was handwritten and initialed in the final order by Loretta's attorney even though the trial court did not mention Dr. Strnad's fee in his opinion. Once those

changes were agreed to, Loretta cannot assign it as error on appeal. *Thomas v. First National Bank* (1985), 134 Ill. App. 3d 192, 212.

Loretta then asserts that the trial court erred in failing to order Richard to account for the cash value of a joint life insurance policy. This argument is without merit.

During the marriage, the parties acquired a $10,000 life insurance policy that had a cash value of $4,000. In 1983, the insurance agent cashed in the policy and absconded with the funds. After Loretta petitioned the court in 1987, the court ordered Richard to cooperate with New York Life to preserve the policy's cash value by contacting the appropriate officer. Richard took no action. As a result, Loretta argues, he should have been required to account for the lost funds.

■■ The trial court did not address the insurance policy issue because it was not asked to address the issue. Furthermore, the testimony is uncontradicted from both parties that neither Loretta nor Richard was responsible for the $4,000 loss. The original court order was for Richard to cooperate with the insurance company, not to recover the funds or to pay Loretta the equivalent amount. Therefore, the trial court did not err by not addressing this issue.

We reject Loretta's next argument, which is that the trial court erred in requiring her to pay a majority of her attorney fees. Although section 508(a)(3) of the IMDMA provides that the trial court may order either party to pay a reasonable amount for attorney fees necessarily incurred by the other party (Ill. Rev. Stat. 1989, ch. 40, par. 508(a)(3)), the payment of attorney fees is the primary obligation of the spouse on whose behalf the services are rendered. *Jones*, 187 Ill. App. 3d at 230.

■■ To justify Richard being required to pay more of her attorney fees, Loretta must show her financial inability to pay them as well as Richard's ability to do so. (*In re Marriage of Hazard* (1988), 167 Ill. App. 3d 61, 71.) Financial inability exists where payment would strip the person of the means of support and undermine her economic stability. (*In re Marriage of Gable* (1990), 205 Ill. App. 3d 696, 700.) It is not necessary for Loretta to be destitute in order for the court to award attorney fees (*In re Marriage of Piccione* (1987), 158 Ill. App. 3d 955, 964), nor is she required to liquidate her assets to pay her own fees before there can be a finding of inability. *Piccione*, 158 Ill. App. 3d at 964.

After careful consideration of all the relevant factors, the trial court did not abuse its discretion in its apportionment of the attorney fees. We affirm that apportionment.

Finally, Loretta asserts that the $4,500 attorney fees awarded to attorney David Goldstein were unreasonable. Loretta argues that he did not participate in the trial, did not take any depositions, and basically reviewed what Loretta's previous attorney had done during the six months that he represented her.

Attorney Goldstein represented Loretta from February 11, 1988, until September 19, 1988, for which Loretta paid him a $2,500 retainer fee. Attorney Goldstein filed a verified petition for fees documenting 52 hours spent in consultations, conferences, preparations of pleadings, court appearances, letters, telephone calls, and court filings at a rate of $125 per hour. Although Goldstein requested a total of $6,500 in attorney fees, the trial court awarded him $4,500, minus the $2,500 retainer fee already paid.

The appropriate amount of attorney fees to be awarded depends on the facts and circumstances of each case and is within the trial court's discretion. (*In re Marriage of Scott* (1980), 85 Ill. App. 3d 773, 782.) The trial court carefully considered the evidence and did not abuse its discretion in awarding the additional attorney fees to Goldstein. Thus, we affirm the trial court's ruling.

Based on the foregoing, the circuit court's rehabilitative maintenance award of $600 per month is affirmed, but the 36-month limit is reversed and remanded. On remand, the trial court is instructed to retain jurisdiction in order to fully review and reevaluate the need for future maintenance after the 36-month period has expired. All other circuit court rulings are affirmed.

Affirmed in part; reversed and remanded in part with instructions.

GREIMAN, P.J., and TULLY, J., concur.