*In re* MARRIAGE OF SLOAN C. HARLOW, Petitioner-Appellee, and CAROL HARLOW, Respondent-Appellant.

Fourth District   No. 4—92—0795

Argued August 18, 1993.—Opinion filed September 30, 1993.

McCULLOUGH, J., dissenting.

Christopher Koester (argued) and Stephen R. Ryan, both of Ryan, Bennett & Radloff, of Mattoon, for appellant.

Paul L. Stone (argued), of Stone & Stone, of Sullivan, for appellee.

PRESIDING JUSTICE STEIGMANN delivered the opinion of the court:

In February 1991, the trial court entered a judgment dissolving the marriage of petitioner, Sloan Harlow, and respondent, Carol Harlow. In its judgment of dissolution, the court ordered Sloan to pay Carol $500 per month in maintenance until May 1992, at which time the maintenance payments would terminate unless either party sought review of the matter prior to June 1, 1992. In May 1992, Carol brought a petition seeking to have the maintenance extended. After a hearing, the court continued the monthly maintenance payments of $500 through August 1992, at which time it held another hearing on the matter. After the August 1992 hearing, the court ordered Sloan to continue to make the monthly payments through August 1993. However, the court reduced the payments to $300 and ordered that maintenance would terminate at the end of August 1993.

Carol appeals that order, alleging that she is entitled to an award of permanent maintenance or, in the alternative, to continued temporary maintenance payments of $500 per month subject to further review after five years. We find that the trial court erred by extending Carol's maintenance for only one year at the reduced amount of $300 per month and thereafter terminating her maintenance. We therefore reverse and remand this case for reconsideration of the duration and amount of the maintenance payments.

I. Background

On February 4, 1991, the trial court entered a judgment dissolving the 32-year marriage of Sloan and Carol. Carol was then 50 years of age and Sloan was 51 years of age. During their marriage, they had three children: Shane, born in April 1962, Kenneth, born in June 1964, and Michael, born in January 1972. During the course of their

marriage, Carol had primary responsibility for raising the children and all the domestic chores around the house. This included cleaning the house, cooking, washing dishes, laundry, shopping, and taking care of the children.

When Carol and Sloan moved to central Illinois from Ohio in 1967, Carol obtained a job as a factory worker. She remained in that position for approximately 11 years, when she quit to stay at home with Michael. He had behavioral problems in school and with baby-sitters. He also had a learning disability.

In August 1988, Carol moved with Michael to Massachusetts and lived with Shane. She enrolled Michael in a special school there. She had hoped that he would complete his schooling there and learn a trade. However, Michael quit school and entered the Job Corps. While living in Massachusetts, Carol worked as an assembly line worker, earning approximately $13,000 per year.

In February 1989, Sloan filed a petition for dissolution of his marriage with Carol. In April 1989, Carol returned to Illinois from Massachusetts and in June 1989, underwent surgery. In August 1989, after she recovered from her surgery, she obtained part-time employment as a salesclerk with Wal Mart. She worked there approximately 20 to 25 hours per week at a salary of $4.10 per hour. In August 1989, she also enrolled in Lakeland Community College to obtain an associates degree in business. Additionally, she worked in a work study program while she went to school, earning approximately $150 per month.

During their marriage, Sloan held various jobs until April 1979, when he obtained employment with the Illinois Power Company (Illinois Power). Since then Sloan had been continuously employed with Illinois Power, working full-time as a lineman. In February 1991, at the time of the dissolution of their marriage, his salary was $18.41 per hour. His gross income for years 1985 through 1990 was as follows:

| | |
|------|---------|
| 1985 | $33,882 |
| 1986 | 34,337 |
| 1987 | 36,677 |
| 1988 | 33,555 |
| 1989 | 38,485 |
| 1990 | 43,583. |

Sloan testified that his 1990 wages were high because of "excessive" overtime.

In the trial court's judgment of dissolution it ordered that the marital property be split in the following manner. Carol received (1) the 1988 Ford Escort, subject to all outstanding debt; (2) a whole life

insurance policy with State Farm Insurance Company; (3) an annuity with State Farm Insurance Company; (4) 60% of the net proceeds (approximately $8,875) from the sale of the marital residence, with 60% of the accrued interest; and (5) 50% of the balance in Sloan's retirement account with Illinois Power (approximately $3,500). Sloan received (1) the 1987 Ford truck, subject to all outstanding debt; (2) the mobile home where he resided, subject to any debt; (3) the proceeds from an annuity with Metropolitan Life Insurance Company that had been cashed ($2,750); (4) the proceeds from Illinois Power stock that had been sold (approximately $550); (5) the balance remaining in a credit union account; (6) sale proceeds from a camper they owned during their marriage ($200); (7) 40% of the net proceeds (approximately $5,900) from the sale of the marital residence, with 40% of the accrued interest; and (8) 50% of balance in his retirement account with Illinois Power.

As stated earlier, the trial court also ordered Sloan to pay Carol $500 per month in maintenance through May 1992, at which time the matter was subject to review upon petition by either party. The court further ordered that if neither party filed a petition by June 1, 1992, maintenance would terminate.

On May 5, 1992, Carol filed a petition for review of the maintenance payments, requesting that the trial court "extend the maintenance payments due and payable by [Sloan] to [Carol]." The trial court held a hearing on May 22, 1992, and heard the following additional evidence. Carol had recently completed her associate degree of applied science in management at Lakeland College. She still held her part-time job with Wal Mart, earning a gross income of approximately $108 a week, but could no longer participate in the work study program. She had recently sent out numerous resumes seeking employment, had a few interviews, but had not received any job offers.

Regarding Carol's financial situation at that May 1992 hearing, she testified to the following. In her financial affidavit, she listed her monthly expenses as $1,336.75, not including a $180 monthly payment on her car and a $50 monthly payment for student loans she took out while attending Lakeland College. She had spent much of the $8,875 she had received from the sale of the marital residence for living expenses, with only about $1,800 remaining at that time. She had rolled over her share of Sloan's retirement account with Illinois Power into an individual retirement account. She retained the annuity (valued at $400) and the life insurance policy (valued at $1,500) with State Farm.

At the conclusion of the May 1992 hearing, the trial court ordered Sloan to continue to pay Carol $500 per month through August 1992.

It further ordered that another hearing would be held in August 1992 to again review the matter. The court also told Carol to continue to vigorously seek employment with her completed education.

At the August 1992 hearing, the trial court heard the following additional evidence. Sloan's circumstances had basically remained unchanged since the proceedings leading up to the February 1991 judgment of dissolution. In 1991, he earned $43,069. Carol had recently taken a part-time job, 35 to 40 hours a week, with Illinois Consolidated Telephone Company as an operator. Her salary was $6.41 per hour (or about $240 per week). She was under probationary status until September 9, 1992, at which time she would be able to join the union and bid for a permanent, full-time position. She had been told that she could expect to get a permanent position after working anywhere from six months to three years. She stated that she only had $1,300 left of her proceeds from the sale of the marital home.

Based on that evidence, the trial court ordered that the "rehabilitative" maintenance be reduced to $300 per month beginning September 1992 and continue in that amount through August 1993, at which time it would terminate. Respondent appeals from this August 1992 order.

## II. Analysis

Primarily relying on this court's decisions in *In re Marriage of Hart* (1990), 194 Ill. App. 3d 839, 551 N.E.2d 737, *In re Marriage of Kerber* (1991), 215 Ill. App. 3d 248, 574 N.E.2d 830, and *In re Marriage of Carpel* (1992), 232 Ill. App. 3d 806, 597 N.E.2d 847, Carol argues for the first time on appeal that she is entitled to permanent maintenance or, in the alternative, to an extension of the $500 payments for maintenance subject to review in five years. The award of maintenance to a spouse is a matter within the sound discretion of the trial court, and on appeal, we will not reverse its decision unless it constitutes an abuse of discretion or is against the manifest weight of the evidence. (*In re Marriage of Morse* (1993), 240 Ill. App. 3d 296, 307, 607 N.E.2d 632, 640; *In re Marriage of Tietz* (1992), 238 Ill. App. 3d 965, 971-72, 605 N.E.2d 670, 675.) Sloan responds that Carol is not entitled to continued maintenance under section 504(a) of the Illinois Marriage and Dissolution of Marriage Act (Act) (Ill. Rev. Stat. 1991, ch. 40, par. 504(a)) and that the trial court's determination to terminate maintenance, based on the factors listed in section 504(b) of the Act (Ill. Rev. Stat. 1991, ch. 40, par. 504(b)), was not against the manifest weight of the evidence.

Under section 504(a) of the Act, the court may grant maintenance when it finds the spouse seeking maintenance lacks sufficient property, including marital property, to provide for her reasonable needs and is unable to support herself through employment or is otherwise without sufficient income. Ill. Rev. Stat. 1991, ch. 40, par. 504(a); *Morse*, 240 Ill. App. 3d at 307, 607 N.E.2d at 640; *Kerber*, 215 Ill. App. 3d at 252, 574 N.E.2d at 832.

Under section 504(b) of the Act, the court shall set the maintenance order in such amounts and for such periods of time as the courts deems just after considering all relevant factors, including the following:

"(1) [T]he financial resources of the party seeking maintenance, including marital property apportioned to [her], and [her] ability to meet [her] needs independently ***;

(2) the time necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment;

(3) the standard of living of the parties;

(4) the duration of the marriage;

(5) the age and the physical and emotional condition of both parties;

(6) the ability of the spouse from whom maintenance is sought to meet his needs while meeting those of the spouse seeking maintenance; and

(7) the tax consequences of the property division upon the respective economic circumstances of the parties." Ill. Rev. Stat. 1991, ch. 40, par. 504(b).

"The benchmark for a determination of maintenance is the reasonable needs of a spouse seeking maintenance in view of the standard of living established during the marriage, the duration of the marriage, the ability to become self-supporting, the income-producing property of a spouse, if any, and the value of the nonmarital property." (*In re Marriage of Cheger* (1992), 213 Ill. App. 3d 371, 379, 571 N.E.2d 1135, 1140.)

Also, no one factor from section 504(b) of the Act is dispositive of whether the trial court should order maintenance. (*In re Marriage of Martin* (1992), 223 Ill. App. 3d 855, 862, 585 N.E.2d 1158, 1163.) Furthermore, a spouse need not be reduced to poverty before maintenance is appropriate nor is she required to sell or impair her assets in order to support herself in a manner commensurate with the standard of living established during the marriage; these factors are particularly significant when, as here, the former spouse has sufficient in-

come to pay some maintenance while still meeting his own needs. *Kerber*, 215 Ill. App. 3d at 252, 574 N.E.2d at 832; *Cheger*, 213 Ill. App. 3d at 379-80, 571 N.E.2d at 1141.

Sloan first argues that section 504(a) of the Act only requires that Carol be able to independently meet her own needs, not that she enjoy the same standard of living she enjoyed during the marriage or that Sloan enjoys after the divorce. Sloan relies on prior decisions which have discussed rehabilitative maintenance as a means to enable a formerly dependent spouse to acquire future financial independence and to place the parties in a position from which they can begin anew. (See *In re Marriage of Henzler* (1985), 134 Ill. App. 3d 318, 322-23, 480 N.E.2d 147, 150; *In re Marriage of Jacks* (1990), 200 Ill. App. 3d 112, 120, 558 N.E.2d 106, 112.) He then asserts that because Carol has completed her associate degree and obtained part-time, probationary employment which she expects will lead to a full-time, permanent position, she has become "rehabilitated," and maintenance is no longer necessary.

■ We reject Sloan's argument that the standard of living established during their marriage does not affect what constitutes Carol's "reasonable needs" under section 504(a)(1) of the Act (Ill. Rev. Stat. 1991, ch. 40, par. 504(a)(1)). Instead, the trial court must balance the realistic ability of the spouse to support herself in some approximation of the standard of living enjoyed during their marriage against a goal of financial independence. (*Carpel*, 232 Ill. App. 3d at 828, 597 N.E.2d at 863.) We further note that a spouse's financial independence is not always the goal when maintenance is awarded. (*In re Marriage of Hensley* (1991), 210 Ill. App. 3d 1043, 1050, 569 N.E.2d 1097, 1101.) While the Act may seek to terminate the financial entanglement of the parties, it did not eliminate the parties' standard of living established during their marriage as a factor in determining whether maintenance is appropriate. *In re Marriage of Lenkner* (1993), 241 Ill. App. 3d 15, 26, 608 N.E.2d 897, 905.

Additionally, under the facts of this case, we further reject Sloan's argument that these parties can be put in position to start "anew" with regard to maintenance. The parties married in their late teens and lived as husband and wife for over 30 years. Through both of their efforts, they raised three children. This court cannot ignore the inevitable financial entanglements resulting from a marriage of this duration.

Regarding Carol's education and subsequent employment, we note that this is only one factor of the seven listed in section 504(b) of the Act. (See Ill. Rev. Stat. 1991, ch. 40, par. 504(b)(2).) As used in con-

nection with section 504(b)(2) of the Act, rehabilitative maintenance may be appropriate when the spouse's future employability would provide an approximately similar standard of living as enjoyed during the marriage. (*In re Marriage of Pearson* (1992), 236 Ill. App. 3d 337, 348, 603 N.E.2d 720, 728.) Under the doctrine of rehabilitative maintenance, the court should consider the receiving spouse's present or future ability to become self-sufficient and should only consider the evidence presented, not mere speculation. *Pearson*, 236 Ill. App. 3d at 348, 603 N.E.2d at 728.

However, permanent maintenance may be more appropriate when the receiving spouse is not employable or is employable only at a low income when compared to the standard of living enjoyed during the marriage. (*Pearson*, 236 Ill. App. 3d at 347, 603 N.E.2d at 728; *In re Marriage of Vendredi* (1992), 230 Ill. App. 3d 1061, 1068, 598 N.E.2d 961, 966.) When former spouses have grossly disparate earning potentials, the goal of financial independence may not be achievable because of the dependent former spouse's inability to maintain the standard of living shared during the marriage. (*Lenkner*, 241 Ill. App. 3d at 25, 608 N.E.2d at 904.) Furthermore, a trial court abuses its discretion by awarding only rehabilitative maintenance when the facts clearly demonstrate that a spouse is unable to support herself in a manner similar to that established during the marriage. *Carpel*, 232 Ill. App. 3d at 828, 597 N.E.2d at 863.

We agree with Sloan that Carol's earning potential has increased since the marriage dissolution because of the associate degree she obtained. However, we disagree that she has been "rehabilitated" merely by obtaining that degree. Based upon the other relevant factors listed in section 504(b) of the Act, we conclude that in this case, the trial court erred by only ordering maintenance to continue for one more year at $300 per month and then to terminate. The parties were married for over 32 years. Carol had the main responsibility for the home and raising the children during the marriage, even when she had outside employment. She is over 50 years of age, limiting her advancement potential even if she obtains a permanent position with Illinois Consolidated Telephone Company. She has limited financial resources and has had to use her assets in order to meet living expenses while she completed her associate degree. Based upon her current salary level of approximately $12,500, she will have to continue to expend her assets to meet her living expenses.

Even with an associate degree, Carol will not likely earn enough income any time in the near future to allow her to enjoy a standard of living commensurate to what she enjoyed during the marriage. We

note that while the parties did not live luxuriously during their marriage, they did live comfortably. They owned a home, two reasonably newer cars, a boat and ski barge, and a camper. They also contributed to two annuities and Sloan's retirement plan.

Furthermore, Carol listed her monthly expenses at $1,337 in her affidavit for the May 1992 hearing. Also, she then had a car payment of $180 per month and a student loan payment of $50 per month. Sloan did not challenge any of her listed expenses either at the May 1992 hearing or the August 1992 hearing, and we find that her listed expenses are not unreasonable. Thus, we emphasize that Carol is not seeking to maintain a luxurious lifestyle or even a standard of living that approximates the standard of living she enjoyed while married to Sloan. Carol merely seeks to meet her monthly expenses, which she is unable to do.

Sloan earned over $43,000 in 1990 and 1991 and is able to meet his needs as well as help meet Carol's needs. Carol's decision to quit work and care for Michael enabled Sloan to continue his employment without interruption. Had Sloan quit his employment to take care of Michael, surely Sloan's present employment situation would have been hampered. As the *Kerber* court noted when quoting from the special concurrence in *Hart*, 194 Ill. App. 3d at 853, 551 N.E.2d at 745 (Steigmann, J., specially concurring):

> " 'Marriage is a partnership, not only morally, but financially. Spouses are co-equals, and homemaker services must be recognized as significant when the economic incidents of divorce are determined. [Respondent] should not be penalized for having performed her assignment under the agreed-upon division of labor within the family. It is inequitable upon dissolution to saddle [respondent] with the burden of her reduced earning potential and to allow [petitioner] to continue in the advantageous position he reached through their joint efforts.' " *Kerber*, 215 Ill. App. 3d at 253-54, 574 N.E.2d at 833.

Based upon our review of the record, we find that the trial court abused its discretion by only extending Carol's maintenance for one more year at the reduced amount of $300 per month and thereafter terminating her maintenance. The record supports her claim that she cannot adequately support herself through employment. However, in her petition for review of maintenance, Carol only requested that the trial court "extend the maintenance payments" she received from Sloan. Because the record does not show that Carol specifically requested the trial court to order permanent maintenance or, alternatively, an extension of the $500 payments for maintenance subject to

review in five years, we cannot address the merits of her request. A request for permanent maintenance cannot be made for the first time on appeal. Accordingly, we reverse the trial court's August 1992 maintenance order and remand this case to the trial court so that the parties and the trial court can specifically reconsider both the duration and the amount of Carol's maintenance.

    ■ Sloan claims that Carol is not entitled to further maintenance because she worked during their marriage (roughly 22 years of their 32-year marriage), in contrast to the wife in *Kerber* who did not work outside the home during the marriage while she stayed home to raise the children. Also, Sloan attempts to distinguish this case from *Kerber* because the wife in *Kerber* had several health problems that prevented her from seeking full-time employment, whereas Carol is in good health and has been able to complete an associate degree and find subsequent employment. We find these claimed distinctions unpersuasive. While Carol may have worked outside of the home at some point during their marriage, that does not negate other duties she fulfilled, *i.e.*, keeping up the house and raising the children. More significantly, Carol's work outside the home did not provide her the means to obtain employment after dissolution of their marriage at a salary level that would allow her to meet her reasonable needs or to maintain the standard of living she enjoyed during the marriage. Her obtaining an associate degree has not yet improved her employment potential to such a level, nor is there much likelihood that it will do so in the near future.

    Sloan further contends that his salary levels at the time of the May and August 1992 hearings did not reflect the standard of living the "parties enjoyed *during* the[ir] marriage," but only reflect conditions after the dissolution, and thus cannot be used to set his level of maintenance payments. While Sloan may be correct regarding the parties' standard of living during their marriage, we note that Sloan's *continuing* ability to meet his needs as well as those of Carol is a factor the court should consider when determining whether maintenance is appropriate. (See Ill. Rev. Stat. 1991, ch. 40, par. 504(b)(6).) Further, the record demonstrates that Carol is not living anywhere near the standard of living established during the marriage.

    ■ Furthermore, the trial court, when determining the amount of the maintenance, should consider on remand *both* (1) the parties' incomes at the time of the dissolution of their marriage, and (2) their potential incomes, as well as that can be determined. By doing so, a court is better able to put both parties in positions of equity regarding their present and future financial circumstances. (See *Hart*, 194 Ill.

App. 3d at 853-54, 551 N.E.2d at 746 (Steigmann, J., specially concurring).) In so holding, we note that our conclusion is consistent with recent revisions to section 504 of the Act, directing the court, when determining the amount of maintenance, to consider the "present and future earning capacity of each party," and "any impairment of the present and future earning capacity of the party seeking maintenance due to that party devoting time to domestic duties or having foregone or delayed education, training, employment, or career opportunities due to marriage." (750 ILCS 5/504(b)(3), (b)(4) (West 1992); see also Pub. Act 87—881, §504, eff. January 1, 1993 (1992 Ill. Legis. Serv. 1060, 1064).) We do not view Public Act 87—881 as changing preexisting law in this regard, but instead as ratifying the interpretation of that law as stated in the specially concurring opinion in *Hart*. (*Hart*, 194 Ill. App. 3d at 853-54, 551 N.E.2d at 746 (Steigmann, J., specially concurring).) Therefore, the trial court's consideration of Sloan's gross income level after dissolution is not only warranted, but required. We add that if, after the trial court enters a new maintenance order on remand, Sloan's income substantially decreases or Carol's substantially increases, Sloan could seek a modification of that maintenance order under section 510 of the Act (Ill. Rev. Stat. 1991, ch. 40, par. 510).

### III. CONCLUSION

For the reasons stated, we reverse the trial court's order extending maintenance for one year at $300 per month and thereafter terminating it and remand for proceedings in accordance with the views expressed herein.

Reversed and remanded.

KNECHT, J., concurs.

JUSTICE McCULLOUGH, dissenting:

Prior to this decision, trial courts, in following the legislative history of maintenance and property division, sought to give finality to personal and financial relationships between parties to a dissolution. With this decision, everyone is welcome back in domestic relations court, at any time, to modify or change trial court orders.

With respect to permanent maintenance, the majority correctly states, "Carol argues for the first time on appeal that she is entitled to permanent maintenance." (251 Ill. App. 3d at 156.) It is necessary to point out the original judgment for dissolution filed on February 4,

1991, did not provide for permanent maintenance. No appeal was taken. The petition heard in May 1992 did not request permanent maintenance. The majority will now allow on remand a consideration of permanent maintenance. *Pearson, Vendredi,* and *Lenkner* do not justify or serve as precedent for such procedure. In *Carpel,* the dissenting opinion of Justice Lund as to maintenance and timely appeal is correct. See *Carpel,* 232 Ill. App. 3d at 833, 597 N.E.2d at 866 (Lund, J., dissenting).

The decision of the trial court was clearly not against the manifest weight of the evidence nor an abuse of discretion. To permit this opinion to stand will have a salutary effect. It will eliminate the need for trial courts to make difficult judgments as to maintenance. The parties should simply come to the appellate court, where we will make the determination *de novo.*

The record reveals that the trial court spent considerable time with respect to maintenance, setting the review hearing for three years from the time of the dissolution. At the May 22, 1992, hearing, there was testimony that Carol had just graduated from Lakeland College and had made numerous applications for jobs, although she was presently working at Wal-Mart. As stated by the majority, the court extended the $500-a-month maintenance for three months and set a further review hearing for August 20, 1992. At the close of the May 22, 1992, hearing, the trial court stated:

"I want you to be certain to understand that this is not a signal by me that I am going to make this an open-ended award. My intention originally in this case was that you do what you have done; that is, complete your education and vigorously seek employment. I will expect you to continue that vigorous search. It will not be my inclination to simply continue this *ad infinitum* until such time as you obtain employment. I will expect that your search and hope that your search will be successful by that time. There will not be any inclination to order repeated extensions of this order."

*Kerber* is easily distinguishable and is not authority for reversing the trial court. In *Kerber,* the parties had a marriage of long duration, the wife had limited resources to meet her needs independently, she had only a high school education so she needed time for educational training to enable her to seek employment, she suffered from debilitating migraine headaches, trigeminal neuralgia, and a painful ankle. Because of the agreed-upon division of labor during the marriage, she stayed home and raised the children and thus was attempting to enter the work force relatively late in life with limited skills.

In reviewing the factors set forth in section 504(b) of the Act, Carol was awarded maintenance for the time necessary to acquire sufficient education or training to enable her to find appropriate employment. There is nothing in the record to indicate Carol's standard of living is different than that established during the marriage. She is in good physical and emotional condition, and there are no tax consequences of the property division. At the August 20, 1992, hearing, Carol had a position with Illinois Consolidated Telephone Company, her probationary status would be served by September 9, 1992, and she would be able to join the union and bid for positions.

There was no agreement that Carol not work and the record appears to indicate the parties agreed Carol should work. At the time of the marriage, she worked as a waitress and quit to look for other employment and did obtain other employment as a nurse's aid. She worked during the years they were married while living in Ohio. They moved to Illinois and Carol worked at General Electric (G.E.) for approximately 11 years beginning in 1967. After terminating her employment at G.E., she worked as a cook and at Young's Radiators. When she moved to Massachusetts, she also obtained a job as an assembly line worker.

The majority states "the record demonstrates that Carol is not living anywhere near the standard of living established during the marriage" (251 Ill. App. 3d at 161) and "while the parties did not live luxuriously during their marriage, they did live comfortably" (251 Ill. App. 3d at 160). A search of the record reveals no such evidence.

With respect to assets accumulated by the parties during the marriage, they purchased a home in 1972 and sold it during the pendency of these proceedings for $30,000, with a net proceeds value of $14,793.41. (Carol received 60% and Sloan 40% of the net.) The two vehicles suggested in the disposition were a 1987 Ford truck with a $6,300 debt against it and a 1981 Buick with a $2,200 debt. The boat and ski barge (one item), purchased by a loan with the 1981 Buick as security, was sold by the parties during the pendency of the dissolution for $1,500, the proceeds of which were used to pay on an outstanding loan against the 1981 Buick which was awarded to Carol. The camper owned by the parties was sold during the proceedings for $200. These assets hardly suggest a standard of living enjoyed by the parties during the marriage which they do not enjoy at this time. Carol purchased a 1988 Ford Escort subsequent to the separation by trading in the 1981 Buick, as to which she testified "I was afraid of the car. It wasn't very reliable, leaking oil," and "And I was just afraid of it," "afraid it was going to fall apart." At the time of the

dissolution, Sloan lived in a $4,640 trailer, of which the full amount was owed to the credit union. The record does not show whether Sloan's income as well as Carol's was expended wisely. Income alone does not set a standard of living. The trial court certainly would be correct in finding that the standard of living enjoyed by the parties during and after the marriage is the same.

Debts for example were not for vacations or luxurious living, but for motor vehicles, $1,000 for the marriage of one son, and living expenses. The record does show that the husband does earn an income in the area of $45,000 per year. During the year 1991, at the time of the dissolution, he was receiving gross wages of $43,850.62. Although there are factors such as the financial resources or earning power of the ex-husband, the age of the ex-wife, the duration of the marriage which could be considered favorable to the ex-wife, the other factors which I have reviewed clearly indicate the decision of the trial court was not against the manifest weight of the evidence.

As we observed in *Hart*, it has been stated that the trial court abuses its discretion "in maintenance award only when no reasonable person could adopt the view of the trial court." *Hart*, 194 Ill. App. 3d at 847, 551 N.E.2d at 741, citing *In re Marriage of Zummo* (1988), 167 Ill. App. 3d 566, 521 N.E.2d 621.

This court has, both in this disposition and in *Carpel* and *Kerber*, quoted the special concurrence in *Hart*. I do not disagree with the quoted statement from the special concurrence in *Hart*; however, the majority decision in *Hart* stated: "We do not adopt the concurring opinion as to maintenance." *Hart*, 194 Ill. App. 3d at 851, 551 N.E.2d at 744.

The majority takes a curious position in stating that if Carol succeeds at some future time in raising her income to a level substantially equivalent to Sloan's income, Sloan can then seek modification of the maintenance order. It appears the majority has been blind-sided by the difference in annual income of the parties and feels that is the primary factor in determining whether maintenance should be paid. This is not the law.

At the close of the hearing on August 20, 1992, Carol, through her counsel, in his argument stated: "based upon the seven factors; based upon the evidence in this case, Your Honor, we are asking the court to *extend the maintenance*." (Emphasis added.) It is important, once again, to show what the trial court stated to the parties at the close of that hearing:

> "Counsel, Mr. and Mrs. Harlow, the original intention of the court's order of maintenance in this case was to accomplish the

rehabilitation of Mrs. Harlow through her efforts in this case. That has been partially accomplished. She has done what the court expected her to do and that was to obtain the education needed to get herself on the way to a firmer foundation in providing her own support. That's the goal of the statute as it is that both parties post divorce to be self-supporting.

The purpose of the review of ability of maintenance award is to look at the present relative situations of the parties particularly with the rehabilitation level that the respondent in this case has obtained. The rehabilitation is near complete but not totally completed.

The decision of the court will be that the rehabilitative maintenance award will be reduced to the sum of $300 per month. It will continue for a period of 12 months from this date at which time maintenance shall terminate and the respondent shall be forever barred from maintenance thereafter."

As stated heretofore, if the decision of the trial court in this case is an abuse of discretion, there will be no case in this appellate court district wherein the trial court will be in a position to make a decision which will not always be subject to second-guessing by this court.