NO. 4-03-0262

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

In re: the Marriage of ) Appeal from

PAMELA M. SELINGER, ) Circuit Court of

Petitioner-Appellant,    ) Sangamon County

and ) No. 01D896

THOMAS M. SELINGER, ) 

Respondent-Appellee.    ) Honorable

) Steven H. Nardulli,

) Judge Presiding.

______________________________________________________________________________

PRESIDING JUSTICE KNECHT delivered the opinion of the court:

In October 2001, petitioner, Pamela M. Selinger, filed a petition for dissolution of her marriage to respondent, Thomas M. Selinger.  The trial court granted the dissolution and entered the final judgment on February 21, 2003.  Pamela appeals, arguing the trial court abused its discretion by (1) purporting to terminate her maintenance award on August 31, 2005, without the possibility of review or extension, (2) awarding her just $400 per month in nonreviewable maintenance, and (3) denying her an award of attorney fees and not providing her with a hearing on her motion for contribution to attorney fees.  We affirm in part as modified and reverse in part.

I. BACKGROUND

The parties married in 1978.  Two children were born, Justin in 1981 and Garret in 1987.  When the dissolution proceedings began, Pamela was 45 years old and Thomas was 46.   Justin had reached his majority, and the custody order granted Pamela custody of Garret.  

Thomas was employed as the director of legislative and public affairs for Central Illinois Light Company (CILCO).  The trial court found Thomas's gross monthly income to be $7,115.38, with a base salary of $92,500 per year.  In addition, the last two years, Thomas had received bonuses of different amounts, and the trial court averaged them for an annual bonus of $8,250 per year.  Thomas was also employed as an alderman for the City of Springfield.  In that capacity he earns an additional $11,735.88 per year.  

Thomas also received a significant amount of money for expenses incurred in his job as a lobbyist, such as mileage, meals, entertainment, and lodging.  Most of this was direct reimbursement for out-of-pocket expenditures necessary for Thomas's employment.  The mileage reimbursement, made according to Internal Revenue Service guidelines, was greater than required to operate his vehicle.  Because Thomas drives a 10-year-old van with high mileage that is paid for, the trial court found the extra amount in mileage was intended by the Internal Revenue Service to be used for replacement of the vehicle.  Thomas was currently using the extra-mileage funds for his children's education expenses, but the court noted he would have to pay for a replacement vehicle in the near future and would need to use those funds for that purpose.  Thus, the court did not consider the mileage reimbursements as gross income to Thomas.

Although the trial court did not make a specific finding as to Pamela's gross income, the evidence indicated she was a registered nurse and received $36,870 per year in 2002 as a nurse recruiter for a local hospital.  

Thomas was ordered to pay $1,267-per-month child support beginning the month the marital home was sold.  He was also ordered to pay $4,560 for tuition and fees per year for Garret to finish his education at the parochial high school he was already attending.  

The parties agreed to sell their $180,000 home and split the proceeds evenly.  It was still for sale at the time of trial.  The parties also agreed that, during the pendency of the dissolution proceedings and until the marital house sold, they would split the expenses involved in the upkeep of the home, with Thomas paying the greater share.  Pamela and Garret continued to live in the home.  Thomas also paid many of Pamela's bills for other living expenses, such as food and clothing, during the pendency of the dissolution proceedings.  The trial court ordered the parties to continue to handle their finances as they had since their separation until the closing of the sale of the marital residence. 

The trial court divided the marital estate virtually evenly with Thomas receiving a net amount of $68,990.50 and Pamela receiving a net amount of $69,647.50.  After both mortgages and the accrued real estate taxes were paid, the parties would each net approximately $29,932.50 on the sale of the marital home, before the realtor's commission, assuming it sold for $180,000.  The remainder of the assets of the marital estate was mostly in retirement accounts and pension benefits, which the court split.  No evidence showed any nonmarital property held by either party.

Pamela was awarded $400 per month in maintenance commencing the first month after the closing on the sale of the marital residence and continuing until August 31, 2005, at which time the trial court ordered it would terminate without the possibility of extension.  Each party was ordered to pay his or her own attorney fees.  This appeal followed.  

II. ANALYSIS

Pamela challenges the maintenance award, arguing (1) the amount of the award was too low in light of her expenses and the standard of living established during the marriage; and (2) the limited duration of the award, particularly without review, was in error, not only in light of the standard of living established during the marriage, but also due to large disparity in income levels between Thomas and herself and the continued disparity in the potential for future earnings.  She also contests the denial of her request for an attorney-fee award.

A. Maintenance Award

The propriety of a maintenance award as well as the amount and duration of the award are matters that lie in the sound discretion of the trial court, and its decision will not be disturbed absent an abuse of discretion.  
In re Marriage of Cheger
, 213 Ill. App. 3d 371, 378, 571 N.E.2d 1135, 1140 (
1991).  An award of maintenance is governed by section 504 of the Illinois Marriage and Dissolution of Marriage Act (Dissolution Act) (750 ILCS 5/504 (West 2002)).  Subparagraph (a) of section 504 sets forth the factors to be considered by the trial court when considering an award of maintenance.  These are as follows:

"(1) the income and property of each party, including marital property apportioned and non[]marital property assigned to the party seeking maintenance;

(2) the needs of each party;

(3) the present and future earning capacity of each party;

(4) any impairment of the present and future earning capacity of the party seeking maintenance due to that party devoting time to domestic duties or having foregone or delayed education, training, employment, or career opportunities due to the marriage;

(5) the time necessary to enable the 

party seeking maintenance to acquire appro-

priate education, training, and employment ***;

(6) the standard of living established

during the marriage; 

(7) the duration of the marriage;

(8) the age and the physical and emotional 

condition of both parties;

(9) the tax consequences of the proper-

ty division ***;

(10) contributions and services by the 

party seeking maintenance to the education,

training, career or career potential, or

license of the other spouse;

(11) any valid agreement of the parties; and

(12) any other factor that the court ex-

pressly finds to be just and equitable."  750 

ILCS 5/504(a) (West 2002).

"The benchmark for determination of maintenance is the reasonable needs of the spouse seeking maintenance in view of the standard of living established during the marriage, the duration of the marriage, the ability to become self-supporting, the income-producing property of a spouse, if any, and the value of the non[]marital property."  
In re Marriage of Tietz
, 238 Ill. App. 3d 965, 972, 605 N.E.2d 670, 676 (1992).

1. 
Duration
 
of
 
Maintenance
 
Payments

The purpose of rehabilitative, or time-limited, maintenance is to provide an incentive for the spouse receiving support to use diligence in procuring training or skills necessary to attain self-sufficiency.  
In re Marriage of Albiani
, 159 Ill. App. 3d 519, 523, 512 N.E.2d 30, 33 (
1987).  This goal, however, must be balanced against the realistic appraisal of the likelihood the spouse will be able to support herself in a reasonable approximation of the standard of living established during the marriage.  
Cheger
, 213 Ill. App. 3d at 378, 571 N.E.2d at 1140.  Limited maintenance is appropriate only where the spouse is employable at an income that would provide the approximate standard of living enjoyed during the marriage.  Permanent maintenance is necessary where a spouse is not employable or is employable only at a low income as compared to her previous standard of living.  
Albiani
, 159 Ill. App. 3d at 523-24, 512 N.E.2d at 33.  Rehabilitative maintenance is an abuse of discretion where the facts are clear that one spouse is unable to support herself in the manner in which the parties lived during their marriage.  
In re Marriage of Carpel
, 232 Ill. App. 3d 806, 828, 597 N.E.2d 847, 863 (
1992).

This case involved a 25-year marriage.  When the parties were first married, Thomas was a university student with a semester left.  After graduation, he began work in the summer of 1978 as a meter reader for CILCO and later worked his way up in the company through an apprenticeship program, becoming a journeyman pipefitter and then a supervisor in the gas shop before gaining his current position as a lobbyist, just several years prior to the end of the marriage.  

Pamela's contribution to the marriage during the years Thomas climbed the corporate ladder was mainly running the parties' home and taking care of their children.  Pamela worked during the first three years of the marriage, but after the birth of the parties' first child, she stayed home to be a full-time homemaker and mother.  She later returned to school, obtained an associate's degree in nursing, and returned to the workforce in 1994 as a registered nurse.  Even though Pamela returned to the workforce, Thomas always earned twice what she did and he usually earned three times as much.  

The parties' son, Garret, had certain learning disabilities that required a great deal of hands-on help with his schoolwork after school hours.  Pamela was the primary helper to Garret as Thomas's job as a lobbyist required him to be away many evenings.  She turned down a position as a nurse supervisor in early 2001 in which she would have earned a salary of $50,000 per year because it would have required her to work late afternoons and evenings and would not have allowed her to give Garret the help he needs after school.  

Thomas earned over $100,000 per year while Pamela earned slightly less than $37,000.  Neither party had unusual or exorbitant expenses.  Neither party had any other source of income other than their salaries and any bonuses they were given.  The parties' income-tax return for 2001 showed a combined gross income over $142,000.  The parties lived in a house worth $180,000, had a 1998 Buick Park Avenue automobile as well as the 10-year-old van, sent their two children to private parochial schools throughout their school-age years, had nice clothes, cleaning help in the home, lawn service, cellular phones, and other indicia of an upper-middle-class lifestyle.  Although they had two mortgages on their home and no evidence suggested lengthy or lavish vacations, the parties lived comfortably.  

The evidence showed Pamela does not need time to obtain either education or training to be employable.  She already attained those goals during the marriage and was employed.  She may be able to earn more once she no longer has the time constraints imposed by helping Garret complete his schooling, but this is not guaranteed.  However, in addition to the assumption that a position as nurse supervisor would be available to Pamela now or in the near future, the evidence on what she could earn in that position would still leave her with an income less than half of what Thomas makes.  

Pamela has a lower earning potential than Thomas.  He should be commended for his success in working his way up the corporate ladder, but he was assisted in that climb by Pamela's willingness to take on the responsibility for managing the household and caring for the parties' children and her not entering the workforce until a much later time.  This deferral of her working life led Pamela to have a vastly disparate earning potential compared to that of Thomas.

"Marriage is a partnership, not only morally, but financially.  Spouses are coequals, and homemaker services must be recognized as significant when the economic incidents of divorce are determined.  Petitioner should not be penalized for having performed her assignment under the agreed-upon division of labor within the family.  It is inequitable upon dissolution to saddle petitioner with the burden of her reduced earning potential and to allow respondent to continue in the advantageous position he reached through their joint efforts."  
In re Marriage of Hart
, 194 Ill. App. 3d 839, 853, 551 N.E.2d 737, 745 (1990) (Steigmann, J., specially concurring).

As this court has previously noted: 

"Where a spouse is employable at an income not overly disproportionate relative to the standard of living established during the marriage, limited maintenance is appropriate. [Citations.] On the other hand, where a spouse is not employable or is employable only at a low income compared to the previous standard of living, indefinite maintenance would be appropriate."  
In re Marriage of Minear
, 287 Ill. App. 3d 1073, 1082, 679 N.E.2d 856, 863 (1997).  

Although the income between the two parties does not permit that they each be able to reside in a $180,000 home after dissolution of their marriage, the
 income is sufficient to provide for better housing than Pamela would be able to afford after August 2005.  Using the income and expense exhibits submitted at trial, Pamela's income, minus child support and maintenance, will leave her only a little over $600 per month to pay for her housing needs.  Thomas, meanwhile, no longer having the obligations of child support, maintenance, or school tuition, would have over $2,500 in income per month 
after
 paying for his housing needs.  Pamela would appear to have a need for more maintenance and Thomas the ability to pay it. 

All maintenance awards are reviewable.  Section 510(a) of the Dissolution Act provides maintenance may be modified upon a showing of a substantial change of circumstances and modification may include termination.  
In re Marriage of Mayhall
, 311 Ill. App. 3d 765, 770, 725 N.E.2d 22, 25-26 (
2000).  An award for a fixed term may be extended (or shortened).  
Mayhall
, 311 Ill. App. 3d at 770, 725 N.E.2d at 26.  "The only apparent difference between a permanent award of maintenance with no provision for review and a fixed award for a period of years is the placement of the burden of proof."  
Mayhall
, 311 Ill. App. 3d at 770, 725 N.E.2d at 26.  A trial court can modify a maintenance order by extension even if the order sought to be modified does not expressly reserve the right for a court to review it as long as the court finds an extension to be appropriate and the petition to extend maintenance is filed within the period of maintenance ordered in the judgment.  
Carpel
, 232 Ill. App. 3d at 825-26, 597 N.E.2d at 860-61.

In its award of maintenance terminating in August 2005, the trial court presumably was attempting to make clear to Pamela the necessity for her to actively pursue a more lucrative position once she is no longer constrained by helping Garret through school.  Clearly, she does have this obligation.  However, the trial court's attempt to make the maintenance award in this case permanently terminate in August 2005 does not prevent either party from petitioning for a modification, including extension, if such a petition is filed prior to August 2005 and a substantial change of circumstances is demonstrated.

While the current maintenance award is clearly reviewable and subject to extension (or shortening), the financial situations of the parties, in view of the standard of living during their marriage, indicates the need for an award of permanent maintenance.  Spouses with disparate earning potentials may warrant an award of permanent maintenance.  See 
In re Marriage of Neuman
, 295 Ill. App. 3d 212, 216, 693 N.E.2d 876, 880 (
1998).  Upon dissolution of marriage, the "optimal goal of the maintenance act is for the dependent former spouse to become financially independent.  However, under circumstances involving former spouses with grossly disparate earning potentials, this goal is often not achievable in light of the dependent former spouse's entitlement to maintain the standard of living established during the marriage."  
In re Marriage of Lenkner
, 241 Ill. App. 3d 15, 25, 608 N.E.2d 897, 904 (
1993).  While the goal of financial independence remains, it is to be measured in terms of the standard of living established during the marriage.  "Where there is a disparity in the earning powers of the former spouses, and the dependent former spouse cannot earn an income sufficient to become financially independent 
at the standard of living established during the marriage
, the dependent former spouse may be entitled to continue to receive maintenance, if the payor spouse is in a position to provide it, even though this does not accomplish the goal of severing the economic ties of the former spouse."  (Emphasis in original.)  
Lenkner
, 241 Ill. App. 3d at 27, 608 N.E.2d at 905-06. 

Even where, as in this case, a former spouse has a good job with a decent income, the reasonable needs of that spouse are still to be measured by the standard of living the party seeking maintenance enjoyed during the marriage, and a permanent maintenance award is justified where the spouse has employment skills but there is a discrepancy between her probable future income and the amount of income that would provide the standard of living she enjoyed while married.  
In re Marriage of Simmons
, 87 Ill. App. 3d 651, 659-60, 409 N.E.2d 321, 327 (1980).

The trial court based its maintenance award on its finding Pamela required maintenance only for so long as Garret continued as a high-school student.  Upon Garret's completion of high school, the court found Pamela would be free to obtain more lucrative employment as her time constraints will be removed and she would no longer need maintenance.  This was a 25-year marriage.  Pamela worked for three years at the beginning of the marriage doing office work while Thomas finished college and started his career.  She did not enter the workforce again for 10 years, while she performed her duties as homemaker and mother.  During that time, Thomas advanced in his career with CILCO.  Pamela now has a lower potential for increased earnings than does Thomas and, after the dissolution of their marriage, will no longer be able to share in the increases Thomas has received due to his rise in the company.  Pamela will have housing needs due to the sale of the marital residence that will not be covered by the equity she obtains from its sale nor does she have any source of income other than her salary.  

The trial court's finding she does not need maintenance after August 2005 is not supported by the evidence either in terms of meeting her reasonable needs or in terms of maintaining some semblance of the standard of living the parties had attained during their marriage.  Therefore, the maintenance award terminating in August 2005 is an abuse of discretion, and we find maintenance should be permanent.

2. 
Amount
 
of
 
Maintenance
 
Award

Pamela also challenges the amount of the maintenance award, claiming it was under a "standard-of-living-of-the-parties analysis."  

The amount of a maintenance award lies within the sound discretion of the trial court, and its decision will not be disturbed absent an abuse of that discretion.  
In re Marriage of Harlow
, 251 Ill. App. 3d 152, 156, 621 N.E.2d 929, 933 (
1993).  The factors of section 504(a) of the Dissolution Act (750 ILCS 5/504(a) (West 2002)) must be considered in determining the amount of maintenance, but they need not be "given equal weight[] so long as the balance struck by the court is reasonable under the circumstances."  
In re Marriage of Miller
, 231 Ill. App. 3d 480, 485, 595 N.E.2d 1349, 1363 (
1992).  As previously noted, the benchmark for a determination is the reasonable needs of a spouse in view of the standard of living established during the marriage as well as the duration of the marriage, the ability to become self-supporting, and the lack of an income-producing spouse.  
Tietz
, 238 Ill. App. 3d at 972, 605 N.E.2d at 676.

Pamela's employment is only one factor to be taken into account in determining the propriety of a maintenance award.  
Lenkner
, 241 Ill. App. 3d at 20, 608 N.E.2d at 904
.  Pamela need not be reduced to poverty or sell assets to support herself.  See 
Harlow
, 251 Ill. App. 3d at 157, 621 N.E.2d at 934
.  These factors are particularly important when her ex-husband has sufficient income to pay maintenance while meeting his own needs.  
Harlow
, 251 Ill. App. 3d at 157-58, 621 N.E.2d at 934.

This court used the "standard-of-living analysis" in 
In re Marriage of Dunlap
, 294 Ill. App. 3d 768, 690 N.E.2d 1023 (1998).  The court in 
Dunlap
 found the maintenance award 
was insufficient because the ex-husband's monthly excess of income over expenses would allow him to contribute more than originally granted by the trial court.  The court noted the resources of the parties would dictate whether they can maintain their lifestyle after dissolution (
Dunlap
, 294 Ill. App. 3d at 773, 690 N.E.2d at 1026, quoting 
In re Marriage of Werries
, 247 Ill. App. 3d 639, 652, 616 N.E.2d 1379, 1390 (1993)) and further noted financial independence did not mean the ability to merely meet minimum requirements but entailed the ability to earn an income that would provide a standard of living similar to that enjoyed during the marriage.  
Dunlap
, 249 Ill. App. 3d at 774, 690 N.E.2d at 1027, quoting 
In re Marriage of Sisul
, 234 Ill. App. 3d 1038, 1039-40, 600 N.E.2d 86, 88 (1992).  

The 
Dunlap
 court employed the standard-of-living analysis to find the parties' marital lifestyle was supported by almost $100,000 per year in after-tax income.  The court then used one half of the net income as a ballpark estimate of the predivorce lifestyle and found each spouse required $48,669 or $4,056 per month to maintain a similar standard of living.  It then found the ex-husband's monthly income after taxes and maintenance was $5,644.  This did not include additional income from farming or investments.  His monthly expenses were $3,697, leaving him with over $2,000 after expenses.  The ex-wife's monthly after-tax income was $442 in wages, $1,488 from investments and $1,250 in maintenance, totaling $3,205.  Her monthly expenses were $3,006.  The court found this left her with a substantial lifestyle deficit.  
Dunlap
, 294 Ill. App. 3d at 774, 690 N.E.2d at 1027.

A similar analysis of the parties' income and expenses in this case would also result in the conclusion Pamela was left with a lifestyle deficit.  Thomas, particularly after he is no longer required to pay child support or school tuition, will be much better off financially than will Pamela.  He will be able to live on his income in excess of $100,000 while she will be left to a lifestyle dictated by her salary of $37,000 or the speculative amount of $50,000 if she were to get a nursing supervisor position.  This is still less than half of Thomas's income.  Prior to the dissolution, the parties were living on a combined income of $142,000 per year.  Although Thomas's high salary as a lobbyist apparently was only reached during the last few years of the marriage, he worked his way up to that position with Pamela's support and work as a full-time homemaker and then as a working mother.     

We agree with the finding of the court in 
Dunlap
 that the standard of living during the marriage should be a factor to be considered in determining the amount of maintenance to be

awarded.  If Pamela's income is insufficient to meet her lifestyle needs and if Thomas has the means to provide for her continuing at least close to her prior lifestyle without compromising his own needs, then she should be entitled to maintenance in that amount unless other factors make the award unreasonable.  See 
Dunlap
, 294 Ill. App. 3d at 774, 690 N.E.2d at 1027.

Using the expense and income figures supplied by the parties to the trial court, Thomas has greater disposable income than Pamela even when child support and maintenance payments are factored in.  While the parties' money does not permit both of them to have the same standard of living as during the marriage, Thomas has sufficient income to provide greater maintenance to Pamela to help close the lifestyle gap between them.  Thus, the amount of maintenance ordered by the trial court was an abuse of discretion.

We conclude the parties have expended all the time and incurred all the attorney fees that they should.  We conclude maintenance should be permanent and in the amount of $600 per month retroactive to the date of final judgment in the trial court.  It is desirable for an order of dissolution to provide for a "clean break."  However, when maintenance is required, that "clean break" cannot be achieved.

B. No Attorney-Fee Award

Finally, Pamela challenges the denial of her request for a contribution to her attorney fees and the lack of a hearing on her motion.  The trial of all the contested issues in this case was held on October 22, 2002.  At no time during that trial did Pamela mention she was requesting contribution from Thomas for attorney fees.  The only reference to attorney fees was on the written suggested distribution of assets and debts submitted by Pamela to the court that day.  At the bottom of the sheet of paper was a line stating Thomas should pay $5,000 toward her attorney fees.  Pamela did nothing to draw the court's attention to this statement.  On November 8, 2002, prior to the entry of the trial court's memorandum of opinion on January 16, 2003, Pamela filed a motion for contribution to attorney fees and costs, requesting that Thomas contribute to her attorney fees and costs, which totaled $8,504.78 through October 2002.  Thomas filed a response to the motion, alleging Pamela had secreted $10,000 in cash from which she could pay her attorney fees.  Pamela then filed a request for documentation of all attorney fees paid by Thomas to his attorney.  

In its order, the trial court ordered each party to pay his or her own attorney fees.  The court noted its decision was made based on the factors to be considered in section 508 of the Dissolution Act.  750 ILCS 5/508 (West 2002).  The court found after the equal distribution of the marital estate, the award of child support, the award of maintenance, and the order that Thomas pay all of the tuition costs for Garret, the resources available to each party were sufficiently similar to require that each pay his or her own attorney fees.

Allowance of contribution to attorney fees and the proportion to be paid by each party are within the trial court's discretion, and its decision will not be disturbed absent an abuse of that discretion.  
In re Marriage of Phillips
, 244 Ill. App. 3d 577, 596, 615 N.E.2d 1165, 1179 (1993).  This discretion on the part of the trial court is based on the language of section 508(a) of the Dissolution Act that "[t]he court from time to time, after due notice and hearing, and after considering the financial resources of the parties, may order any party to pay a reasonable amount for his own or the other party's costs and attorney's fees."  750 ILCS 5/508(a) (West 2002); 
In re Marriage of Ziemer
, 189 Ill. App. 3d 966, 969, 546 N.E.2d 229, 231 (
1989).

The propriety of an award of attorney fees is dependent on a showing by the party seeking them of an inability to pay and a demonstration of the ability of the other spouse to do so.  The court may consider prospective as well as current income in awarding fees.  
Phillips
, 244 Ill. App. 3d at 595, 615 N.E.2d at 1179.

Pamela argues the trial court erred in denying her fees without a hearing as required by section 508(a).  Section 503(j) of the Dissolution Act establishes the method for formally petitioning the court for contribution of attorney fees.  Its provision states in pertinent part: "before judgment is entered, a party's petition for contribution to fees and costs incurred in the proceeding shall be heard and decided."  750 ILCS 5/503(j) (West 2002).  

Use of the word "shall" creates an affirmative duty on the trial court to hear and decide fee-contribution petitions.  This does not mandate a separate hearing, but additional proofs, through testimony or otherwise, must be heard.  
In re Marriage of Brackett
, 309 Ill. App. 3d 329, 345, 722 N.E.2d 287, 300 (
1999).  "[T]he plain and ordinary meaning of section 503(j) of the Act is that the trial court 
must
 hear and decide a party's petition for contribution to attorney fees after the close of proofs on all other issues."  (Emphasis in original.)  
Brackett
, 309 Ill. App. 3d at 345, 722 N.E.2d at 300.  

In 
Brackett
, the ex-wife filed a petition for contribution pursuant to section 503(j) at the close of evidence.  The final judgment ordered each party to pay his or her own attorney fees and denied the petition for contribution.  
Brackett
, 309 Ill. App. 3d at 333, 722 N.E.2d at 291.  The court found, however, the record
 contained neither an indication of a separate ruling on the petition nor an indication that evidence was presented on the amount of attorney fees owed by either respondent or petitioner.  Thus, the case was remanded for taking evidence and ruling on the petition for contribution as mandated by section 503(j).  
Brackett
, 309 Ill. App. 3d at 346, 722 N.E.2d at 300. 

In this case, the trial court's finding in its order implies it considered Pamela's request for fees because it specifically found, due to the distribution of assets and the payments ordered, the incomes of the parties were not sufficiently different to warrant an award of fees.  The court noted specifically its determination was made pursuant to section 508, which gives it the discretion to make such a determination after due notice and hearing.

The lack of a hearing here is not dispositive.  The assets and liabilities of the two parties were before the court already, as was the amount of Pamela's attorney fees.  We fail to see what other evidence had to be presented for the court to rule on Pamela's request.  Further, we note Pamela waited to file her request for fees until several weeks after the close of proofs in this case, at a time when the parties were not in person before the court.  It was then up to her to call it to the court's attention if she believed an additional hearing was necessary prior to issuance of the court's order.  Failing that, it was then Pamela's responsibility to call to the court's attention its failure to hold a hearing within 30 days of the entry of the order and before this appeal was filed.  The failure to hold a hearing would have been easily correctable in the trial court.  Her failure to take these steps does not allow her to now challenge the trial court's alleged failure to hold a hearing on her motion for contribution to attorney fees.  See 
Minear
, 287 Ill. App. 3d at 1079-80, 679 N.E.2d at 862; 
In re Marriage of Harper
, 191 Ill. App. 3d 245, 246, 547 N.E.2d 574, 575 (1989).

As to the court's finding no contribution to attorney fees was warranted, we find no abuse of discretion.  In view of our decision to 
award permanent maintenance
 in a greater amount, disparity in income levels between the parties will not be large enough to require contribution to Pamela's attorney fees.

III. CONCLUSION

For the reasons previously stated, we affirm the trial court's judgment ordering both parties to pay their own attorney fees.  We reverse the court's judgment ordering $400-per-month maintenance ending in August 2005 and award permanent maintenance of $600 per month retroactive to the date of the final judgment in the trial court.  We commend respondent for his cooperative attitude and payment of living expenses during the pendency of the legal proceedings. 

Affirmed in part as modified and reversed in part.

STEIGMANN, J., concurs.

COOK, J., dissents.

 

JUSTICE COOK, dissenting:

I respectfully dissent and would affirm the judgment of the trial court.

The majority speaks of measuring needs "by the standard of living the party seeking maintenance enjoyed during the marriage."  Slip op. at 12.  The majority speaks of Pamela's "lifestyle deficit."  Slip op. at 15.  In reality, what the majority is concerned about is that Thomas will have greater disposable income than Pamela.  Slip op. at 16.  The majority does not actually compare Pamela's lifestyle with her previous lifestyle, although it concedes that she has a good job with a decent income.  Slip op. at 12.  The majority has come up with a rule, that in long-term marriages, not only should the property of the parties be divided equally, the future income of the ex-husband should be divided equally, for the rest of the parties' lives.  If the ex-husband can pay more, he should be required to do so.  (Apparently this rule would work only one way; I see no indication in the cases that it would be applied where the ex-wife is the primary income earner.)  The difficulty with adopting such a rule that the legislature, which is charged with that responsibility, has not done so.

According to the majority, permanent maintenance should be the rule, not the exception.  "Spouses with disparate earning potentials warrant an award of permanent maintenance."  Slip op. at 11.  It makes no difference whether each spouse has a decent income; disparity requires permanent maintenance.  The maintenance award must be set at the maximum possible.  The majority cites 
Dunlap
, where "the ex-husband's monthly excess of income over expenses would allow him to contribute more than originally granted by the trial court."  Slip op. at 14.      

Even if we were the legislature, reasons militate against adopting such a rule.  There is an advantage, in dissolution of marriage cases, to orders that provide for a "clean break."  Should these parties really be examining each other's income and expenses for the rest of their lives and complaining that the other is not working hard enough and about how the other is spending his or her income?  The majority in effect is refusing to dissolve the marriage of these parties, ordering that they be tied to each other for the rest of their lives.

The trial court provided some future protection for Pamela when it awarded her half of Thomas's retirement accounts and pension benefits.

The majority's rule is at odds with the Dissolution Act.  The Dissolution Act recognizes that one spouse may have better income abilities than the other spouse.  That is why the spouse with superior income may be required to turn over more than 50% of the assets or pay some child support expenses in their entirety, as here.  That is why the spouse with lesser income may be allowed to remain in the house until it is sold.  That is why the spouse with superior income may be required to pay the other's attorney fees.  Why isn't the trial court allowed to focus on the present and require the spouse with the superior income to pay more now?  Why is the trial court required to give the spouse with lesser income an equal share of uncertain future income?    

The majority speaks of Pamela's contribution to Thomas's income potential and how it was her "deferral of her working life [that has] led Pamela to have a vastly disparate earning potential compared to that of Thomas."  Slip op. at 9.  How can we be sure of that?  If the parties had remained single all their lives, would Pamela's income have equaled Thomas's?  This marriage was not a one-way street.  Pamela's earning potential was enhanced by the education and training she was able to attain during the marriage.  Slip op. at 8.  Is it not possible that the trial court took all of this into consideration in giving Pamela half of the marital assets?  How can we say the trial court erred if it concluded that Thomas's contribution to those assets was greater than Pamela's?  The majority may be attempting to cure a disparity in income which exists generally in our society (despite recent advances, men generally receive more income than women), not a disparity related to marriage.     

The idea that the trial court has any discretion at all is certainly called into question by the court's decision today.  It appears that the trial court's only discretion is to come up with a maintenance award acceptable to us.  We do not identify any particular error committed by the trial court.   We are not complaining about any mistakes made by the trial court; we are complaining simply about the result it reached. 

Finally, I disagree with the majority's decision to make its increase in maintenance retroactive.  The trial court's maintenance order was effective immediately after it was entered, and the payments have been made.  See 750 ILCS 5/413(a) (West 2002) (judgment final when entered, subject to right of appeal; "An order directing payment of money for support or maintenance *** shall not be suspended or the enforcement thereof stayed pending the appeal").  Past-due installments of child support or maintenance are a vested right, and a court has no authority to modify them, either by increasing or decreasing them.  
In re Marriage of Burbridge
, 317 Ill. App. 3d 190, 193, 738 N.E.2d 979, 982 (2000) (child support); 
In re Marriage of Frasco
, 265 Ill. App. 3d 171, 179, 638 N.E.2d 655, 661 (1994) (maintenance); 
In re Marriage of Ingram
, 259 Ill. App. 3d 685, 691, 631 N.E.2d 386, 391 (1994) (child support).  The provisions of any judgment respecting maintenance or support may be modified only as to subsequent installments.  750 ILCS 5/510(a) (West 2002).  The only exception is that where a petition to modify is filed, the court may modify "installments accruing subsequent to due notice by the moving party of the filing of the motion for modification."  750 ILCS 5/510(a) (West 2002).  

Even if we had the power to retroactively increase past-due installments of maintenance, it would be a mistake to do so.  
Both child support and maintenance look to a particular period.  The recipient has needs during a particular period, and it does not help meet those needs for a retroactive award to be made after the period has ended.  Likewise, it is a real burden for the payor, who has made regular payments, to suddenly be ordered to pay a lump sum.